Francine D. MORRISON, Plaintiff,

v.

AMERICAN BOARD OF PSYCHIATRY
AND NEUROLOGY, INC.,
Defendant.

No. 95 C 5064.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 4, 1996.

Diana Triplett Epstein, Marilyn F. Long-
well, Law Offices of Marilyn F. Longwell,
Chicago, IL, for plaintiff.

James W. Rankin, Roibin John Ryan, San-
dra A. Miller, Kirkland & Ellis, Chicago, IL,
for defendant.

*MEMORANDUM OPINION
AND ORDER*

SHADUR, Senior District Judge.

Francine Morrison ("Morrison") has sued the American Board of Psychiatry and Neurology, Inc. ("Board"), alleging that Board discriminated against her on racial grounds (she is African–American). Morrison's Complaint contains two counts: Count I under Title VII of the Civil Rights Act of 1964 as amended ("Title VII," 42 U.S.C. § 2000e to 2000e–17[1]), and Count II by way of 42 U.S.C. § 1981 ("Section 1981").

Board now moves to dismiss both counts under Fed.R.Civ.P. ("Rule") 12(b)(6).[2] For the reasons stated in this memorandum opinion and order, Board's motion is denied in its entirety.

*Facts*[3]

Morrison is an African–American psychiatrist who is employed by two medical facilities in New Orleans (Complaint ¶ 3). As for Board, Complaint ¶ 4 describes it in these terms:

> Defendant, AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY ... constructs, administers, and evaluates the only examinations for board certification in psychiatry in the United States, and as such, the Board controls a psychiatrist's eligibility for employment and staff privileges at many hospitals and other health organizations.

1. Citations to Title VII will take the form "Section—," employing the Title 42 numbering rather than Title VII's internal numbering.

2. As originally tendered, Board's motion was framed in the alternative: either for dismissal under Rule 12(b)(6) or for summary judgment under Rule 56. When this Court then established the briefing schedule, it specified that the motion would be addressed solely in Rule 12(b)(6) terms, and the parties proceeded to brief the motion in that fashion. Nonetheless the current computer printout of "pending motions" somehow continues to reflect the summary judgment motion as still alive. In an effort to defeat the inexorable computer, this Court again orders that the Rule 56 motion be denied without prejudice.

3. This caption does not suggest that this Court has actually made any factual findings. Instead

Complaint ¶ 16 sets out a number of consequences of Board noncertification that Morrison's Mem. 14 summarizes by saying that Board certification "is a large, if not the primary factor which patients consider and many hospitals require in choosing or hiring a physician."

Board certification begins with a full-day written exam that an applicant must pass as a prerequisite to taking an oral examination (Complaint ¶ 7). If successful, applicants move on to the oral portion of the exam, comprising a "video" portion and a "live patient" portion that must be passed during the same testing period (*id.* ¶¶ 8–11).[4]

In 1992 Morrison passed the written portion of the exam (Complaint ¶ 7) but failed both portions of the oral examination (*id.* ¶ 8). Then in April 1993 Morrison tried once again, this time passing the live patient portion of the oral exam but failing the video portion (*id.* ¶¶ 9–11). Morrison says that both of the examiners for that video portion were white males (*id.* ¶ 9) and that a white female who made the same differential diagnosis as Morrison on the video portion received Board certification though Morrison did not (*id.* ¶ 10).

Morrison took the oral exam again in October 1993. On that occasion she passed the video portion but failed the live patient portion (Complaint ¶¶ 13–14). Both of the live patient segment examiners were white, one male and one female (*id.* ¶ 13), while the video portion examiners were an Asian male and a white female (*id.* ¶ 14).

it reflects the familiar Rule 12(b)(6) principles that this Court must accept as true the Complaint's well-pleaded factual allegations, together with all reasonable inferences in Morrison's favor (*Bowman v. City of Franklin*, 980 F.2d 1104, 1107 (7th Cir.1992)), and that dismissal is appropriate only if Morrison could prove no set of facts consistent with the Complaint's allegations that would entitle her to relief (*Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984)).

4. Once an applicant passes the written exam, he or she need not take the written exam again. On the other hand, passing one portion of the oral examination does not carry forward to the next testing session—instead an applicant must pass both parts during the same testing period.

Morrison claims that Board discriminated against her on race-based grounds throughout her attempt to become Board certified. First she alleges that Board's requirement that she send a photograph of herself as part of the application process enabled Board to discriminate against her by assigning her to a more difficult oral examination facility, by assigning her to a more difficult patient profile and by assigning biased examiners to her (Complaint ¶ 15(a)). Next she says that Board discriminated against her in October 1993 by failing her while passing a similarly-situated white applicant (the one who made the same differential diagnosis) (*id.* ¶ 15(c)). Morrison also alleges generally that Board's use of a subjective evaluation system for the oral exam permits the introduction of prohibited racial biases into the system (*id.* ¶ 15(b)).

Morrison alleges that Board's discriminatory denial of certification has caused her to suffer economic harm in a number of ways (Complaint ¶ 16):

1. She will not be considered (in New Orleans, elsewhere in Louisiana or in the United States generally) for employment in hospitals and other health organizations, or for participation in HMOs, that require psychiatrists to be Board certified.

2. Her salary with her current employer is lower than it would have been if she had become Board certified.

3. Her lack of Board certification brings her expertise into question from current and future employers as well as potential private-practice patients.

### Title VII Claim

Morrison's Title VII claim is not a mainstream Title VII claim because she does not—and could not—allege that Board is her employer. Instead she relies on a theory—one that originated in *Sibley Memorial Hosp. v. Wilson,* 488 F.2d 1338 (D.C.Cir. 1973) and was later adopted by our Court of Appeals in *Doe v. St. Joseph's Hosp.,* 788 F.2d 411 (7th Cir.1986)—that extends Title VII liability beyond a direct employment re-

lationship to "employers"[5] who are in a position to interfere with the employment relationship between the Title VII plaintiff and some third party.

*Sibley* and *Doe* teach that an employer can be held liable under Title VII if it discriminatorily exploits its power over an individual to interfere with that individual's employment by a third party. In so holding, both cases relied on the facts (1) that Section 2000e-2(a) does not describe the Title VII plaintiff as an "employee," instead using the broader term "any individual," and (2) that the Supreme Court has repeatedly pointed out that Congress' broad purpose in enacting Title VII was "to achieve equality of employment opportunities" (*Griggs v. Duke Power Co.,* 401 U.S. 424, 429, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)).

Virtually every case that applies the *Sibley* theory (including *Doe* ) specifically points to the following basis on which *Sibley,* 488 F.2d at 1341 justified such extension of Title VII beyond a direct employment relationship:

Control over access to the job market may reside, depending upon the circumstances of the case, in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious grounds, access by any individual to employment otherwise available to him. To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone the continued use of the very criteria for employment that Congress has prohibited.

Courts have invoked the *Sibley* approach to allow Title VII claims to go forward in a variety of situations: a hospital's discriminatory withholding of staff privileges from a doctor, thus hindering his ability to serve and

---

**5.** This usage requires some explanation. While *Sibley* and *Doe* hold that a defendant need not be *plaintiff's* direct employer to be held liable under Title VII, those cases still require as a condition

of Title VII coverage that defendant nonetheless meet the statutory "employer" requirement that it have 15 or more employees (Section 2000e(b)).

retain patients (*Doe*, 788 F.2d at 421–25 and *Vakharia v. Swedish Covenant Hosp.*, 765 F.Supp. 461 (N.D.Ill.1991)); the discriminatory administration of a teacher certification test by a state commission that was not the teachers' ultimate employer, with the test being a prerequisite to teaching in any California public school (*Association of Mexican–American Educators v. California*, 836 F.Supp. 1534 (N.D.Cal.1993)); and a private firefighting school's discriminatory failure to certify a would-be firefighter, thus preventing her from pursuing that occupation (*Dunn v. St. Louis County*, 1989 WL 35541 (E.D.Mo. Mar. 31, 1989)).

Board counters by asserting (1) that it is the functional equivalent of licensing agencies that have been excluded from operation of the *Sibley* theory on public policy grounds and (2) that it is not in a position that enables it to interfere with Morrison's employment relationship with third parties. Those arguments will be considered in turn.

### Is Board a Licensing Agency?

■ Board correctly states that a number of courts have held that boards acting in their capacity as licensing examiners are not covered by Title VII.[6] But when sought to be applied to the facts as Morrison alleges them, that public-policy-based position is not at all the knockdown winning argument that Board makes it out to be.

6. For example, bar examiners have quite consistently been held outside the reach of Title VII (e.g., *Woodard v. Virginia Bd. of Bar Examiners*, 598 F.2d 1345 (4th Cir.1979) (per curiam)), as have a veterinary board (*George v. New Jersey Bd. of Veterinary Medical Examiners*, 635 F.Supp. 953 (D.N.J.1985)) and a dental board (*Haddock v. Board of Dental Examiners*, 777 F.2d 462 (9th Cir.1985)) in their capacities as licensors.

7. Board does not cite, and this Court could not locate, any case in which our Court of Appeals exempted a licensing agency from Title VII.

8. *Haddock*, *Woodard* and *Tyler v. Vickery*, 517 F.2d 1089 (5th Cir.1975).

9. *National Org. for Women v. Waterfront Comm'n*, 468 F.Supp. 317, 320–21 (S.D.N.Y.1979) and *Delgado v. McTighe*, 442 F.Supp. 725, 729–30 (E.D.Pa.1977).

10. This Court is of course mindful of the suggestion in *Shrock v. Altru Nurses Registry*, 810 F.2d

Board cites nine cases (none from this Circuit[7]) for the proposition that licensing boards should be excluded from Title VII. Three of those cases[8] do not discuss *Sibley* at all—instead they adopt the narrow reading of Title VII (as covering *only* direct employers, employment agencies and labor organizations) that *Sibley* and *Doe* rejected. Two other cases[9] explicitly rejected the *Sibley* reading of Title VII, so even if they had been of potential precedential value (as they are not, both being District Court opinions) they would be of no help to Board—the *Sibley* theory remains good law in this Circuit.[10]

Nor is Board aided by the remaining four cases that do discuss *Sibley*. Only one of those, *Darks v. City of Cincinnati*, 745 F.2d 1040, 1042 (6th Cir.1984), was a Court of Appeals decision, and it distinguished *Sibley* not by pointing to the city's role as licensor, but rather by ruling that the city did not have a sufficient amount of control over plaintiff to bring it within the *Sibley* theory. Two of the three District Court decisions— *Lavender–Cabellero v. Department of Consumer Affairs*, 458 F.Supp. 213, 215 (S.D.N.Y.1978) and *George*, 635 F.Supp. at 955—recognized the tension that arises between *Sibley* and the licensing cases, and both sought to distinguish *Sibley* because boards that issue licenses that are a precondition to holding a job in a particular field perform what amounts to a policing function of public importance.[11] Finally, *Johnson v.*

658, 660 (7th Cir.1987) (emphasis added) that the viability of *Doe* (and thus of the *Sibley* theory) may be in question:

> We therefore need not decide when, *if ever*, an employer covered by [Title VII] can be held liable for conduct toward someone who is not its employee....

And most recently *EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir.1995) (authored by the same judge who spoke for the court in *Shrock*) has cited to *Doe* in a way that, even though not directly impugning its continued vitality, is enough to give pause in that respect. But at any rate, so long as *Doe* has not explicitly been overturned, this Court's duty is to follow *Doe* in recognizing and applying the *Sibley* theory.

11. That is not at all a convincing rationale. If Title VII bars a party from placing a discriminatory impediment between an individual and his or her employment relationship with a third party, it is certainly inconsistent to conclude that

*Greater Southeast Community Hosp. Corp.,* 903 F.Supp. 140, 148–49 (D.D.C.1995) distinguished *Sibley* because it found no employment relationship, so that it discussed the licensing contexts only tangentially.

Thus the cases cited by Board would provide dubious support at best for the potential application of a licensing exception to the *Sibley* theory here. But that need not be decided in any event, for Board has itself conceded (its Mem. 5) that it is a private association that does not issue licenses to practice, but instead certifies the achievement of a level of expertise.[12] For the suggested licensing exception to *Sibley* to apply, the only potentially relevant cases (*Lavender-Cabellero* and *George* ) make it clear that the reason for the exception is that the agency involved performs an "in-or-out" screening function for the public—it has the power to decide, on behalf of and for the good of the public, who is and who is not qualified to participate in a given profession. By admitting that Board is *not* a public organization and that Board certification is *not* required for the practice of psychiatry, Board deals a fatal blow to its own argument.

### Is Board in a Position To Interfere?

■ Board's second contention is essentially that it is not in a position to impede Morrison's employment opportunities with third parties. But because that denial is directly at odds with Morrison's Complaint allegations—an impermissible position to take in the current Rule 12(b)(6) context—Board's argument is somewhat attenuated: It says that it cannot affect Morrison's employment to the same degree as the other

indirect employers that have been held liable under the *Sibley* theory.

■ Analysis of that argument requires a recognition of the two distinct aspects of the *Sibley* approach. First, it requires an employment relationship or potential employment relationship between the Title VII plaintiff and some third party.[13] Second, the Title VII defendant must be capable of interfering with plaintiff's employment relationship with that third party.

There is no question that Morrison has sufficiently alleged a prospective employment relationship to survive the motion to dismiss—Board does not even raise that issue. As already stated, Morrison asserts that a lack of Board certification will hinder both her ability to be employed by private patients and her ability to enter into employment relationships with medical facilities that require Board certification. That is enough at this early pleading stage.

It is rather the second *Sibley* component with which Board quarrels: the notion that it is sufficiently able to impede Morrison's future employment prospects to bring it within the *Sibley* theory. As indicated at the beginning of this section, Board contends that the employer's ability to impede was higher in the *Sibley* line of cases than it is here.

In addition to the earlier-referred-to aspects of the economic impact on Morrison drawn from Complaint ¶ 16, Morrison alleges in Complaint ¶ 4 that "the Board controls a psychiatrist's eligibility for employment and staff privileges at many hospitals and other health organizations." This Court must take that as true for purposes of Board's motion.

because the function of a licensing board is to impose restrictions for the public good it should not be held liable for doing so in a discriminatory manner. Indeed, it is doubtful whether the licensing exception can survive in intellectual harmony with the *Sibley* theory (see 1 Lex Larson, *Employment Discrimination* § 4.01[2] (2d ed. 1995)).

**12.** As Board has pointed out, that view of its role is backed up by *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 250 (7th Cir.1994).

**13.** *Vakharia,* 765 F.Supp. at 463–66 considered whether the "employment relationship" contem-

plated by the *Sibley* theory was a fictional one between plaintiff and defendant (which does not employ, but has control over, plaintiff) or an actual one between plaintiff and the third party with which defendant interferes. *Vakharia* concluded that it was the latter, a conclusion that has since been buttressed by the language of *EEOC v. Illinois,* 69 F.3d at 169 (emphasis added):

But the cases in question are ones in which the defendant so far controlled the plaintiff's employment relationship that it was appropriate to regard the defendant as the de facto or indirect employer of the plaintiff, *as where a hospital prevents a nurse from being employed by a hospitalized patient.*

To date the case law has provided no clear test as to what level of control is sufficient to bring an employer's potential for interference under the *Sibley* rubric.[14] It will be remembered that in the clearest situation, where a defendant has total control over a plaintiff's future employment relationships—cases where a license is an absolute prerequisite to working in a particular field—some courts have carved out an exception to *Sibley*. What has developed in the less-than-bright-line situations is a case-by-case analysis of whether a defendant "significantly affects access of any individual to employment opportunities" (*Doe,* 788 F.2d at 424, quoting *Spirt v. Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054, 1063 (2d Cir.1982)). .

Under these circumstances it would surely be premature to dismiss Morrison's Title VII claim without letting Morrison develop her case further (something that might also allow for the further development—or perhaps the disavowal—of the doctrine on which she relies). Of course Board does not have total control over Morrison's employment opportunities: After all, she is currently able to practice as a psychiatrist, and she has not alleged that *all* medical facilities and private patients make Board certification a prerequisite to employment. But total foreclosure from future employment opportunities is not necessary under the *Sibley* approach—both *Sibley* and *Doe* involved plaintiffs who were allowed to advance their claims even though they could have found employment elsewhere in the same field.

In sum, Morrison has alleged that the lack of Board certification will significantly inhibit her future employment prospects, and that suffices to survive Board's motion to dismiss her Title VII claim. That aspect of the Rule 12(b)(6) motion is therefore denied.

### Section 1981 Claim

Section 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens. ...

And "make and enforce contracts" is defined by Section 1981(b) as including:

the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

Morrison alleges that Board's discriminatory denial of certification violates Section 1981 by impeding her ability to contract with the already-discussed categories of future employers (both medical facilities and private patients).

Board seeks to counter that claim in two ways. For one thing, it contends that the claim cannot survive because Morrison has not alleged that Board has interfered with her efforts to make a specific contract, as contrasted with assertions of "lost economic opportunities" that are too speculative to be recognized under Section 1981. For another, it essentially repeats its Title VII argument by asserting that Board does not have the kind of "active control" over Morrison's ability to contract that is needed to call Section 1981 into play.

### Are Morrison's Economic Damages Too Speculative?

▌ In support of its position that Morrison's asserted "lost economic opportunities" do not suffice to ground a Section 1981 claim, Board cites a handful of cases, all but one of which (*Setliff v. Memorial Hosp. of Sheridan County,* 850 F.2d 1384, 1394–97 (10th Cir. 1988); *Goulding v. Feinglass,* 811 F.2d 1099, 1102–03 (7th Cir.1987); *Perry v. FBI,* 781 F.2d 1294, 1300–03 (7th Cir.1986) (en banc); *Munson v. Friske,* 754 F.2d 683, 692–94 (7th Cir.1985)) were due process cases advanced under 42 U.S.C. § 1983 ("Section 1983") or its federal equivalent (a *Bivens* claim). Each

---

**14.** Board unpersuasively urges the adoption of a "means and manner" test for that purpose. But the "means and manner" approach is rather one of three that various Circuits use to determine whether an employer-employee relationship exists between the Title VII plaintiff and a third person (see *Vakharia,* 765 F.Supp. at 466–69), not to determine whether a Title VII defendant has enough control to be brought within the *Sibley* theory. As for the actual "means and manner" test, Morrison has surely alleged prospective employment relationships with medical facilities and with private patients so as to qualify under *Sibley.*

of those cases discusses the "stigma-plus" burden—initially set out in *Paul v. Davis,* 424 U.S. 693, 712, 96 S.Ct. 1155, 1165–66, 47 L.Ed.2d 405 (1976)—that confronts a Section 1983 plaintiff who claims a deprivation of a liberty or property interest without due process of law.

■ But those cases do *not* stand for the proposition (as Board contends) that lost economic opportunities will not ground a *Section 1981* claim—after all, Section 1981 differs sharply from Section 1983 in a fundamental way that has to be known to knowledgeable counsel such as the law firm representing Board here. Because Section 1983 claims find their roots (with limited exceptions not now relevant) in constitutional deprivations by state actors, a plaintiff's efforts to draw sustenance from the Fourteenth Amendment's Due Process Clause must identify a deprivation of liberty or property—hence the demand that has been defined by *Paul v. Davis* and its progeny. By dramatic contrast, Section 1981 affords relief against private parties that, on prohibited race-based grounds, interfere with even a single contract (see, e.g., *Sample v. Aldi Inc.,* 61 F.3d 544 (7th Cir.1995), which deals in identical terms with a Title VII claim and a Section 1981 claim of racial discrimination that impacts on plaintiff's employment by a single employer).

Even apart from the total inapplicability of the Section 1983 liberty-interest cases cited by Board, in this instance Morrison has alleged more than abstract or pie-in-the-sky lost economic opportunities. She says expressly that without Board certification she will suffer the identifiable harm of being unable to contract with the many medical facilities that require Board certification (Complaint ¶¶ 16(a), 16(b), 16(c) and 16(d)). Even Complaint ¶ 16(e), which alleges that the lack of Board certification has deprived Morrison of a salary increase in her present

job, arguably falls within Section 1981's prohibition against interference with the *modification* of contracts.[15]

Of all the cases cited by Board, only *Phelps v. Wichita Eagle–Beacon,* 886 F.2d 1262 (10th Cir.1989) is at all potentially helpful to it. *Phelps, id.* at 1267 (emphasis in original) held that an allegation of *"possible* loss of *future* opportunities"—including "prospective business opportunities"—does not state a claim under Section 1981. But Board is simply wrong in paralleling that flawed allegation to Morrison's express allegations that Board's denial of certification will in fact prevent her from entering into future employment contracts. As the quoted language from *Phelps* suggests, that case involved a claim that a newspaper's alleged libel of plaintiff violated his Section 1981 right to contract because the harm to his reputation would keep him out of unspecified future business relationships. That speculative assertion contrasts sharply with the Morrison allegations (with the exception of Complaint ¶ 16(f)) that many medical facilities and private patients make Board certification a prerequisite to employment. Neither *Phelps* nor any of the other cases cited by Board entitles it to the granting of its Rule 12(b)(6) motion.

### *Reprise: Is Board in a Position To Interfere?*

■ Board goes on to argue that even if Morrison has alleged actionable harms under Section 1981, Board is not in a position to interfere with Morrison's ability to contract with future employers. Board's Mem. 7 argues that each of the cases that Morrison relies on involves a party that plays a more "active role" in restricting a plaintiff's ability to enter into or enforce a contract.

Of course that contention produces a sense of deja vu: As already discussed in the con-

---

**15.** Only the following allegation (Complaint ¶ 16(f)) arguably comes within the scope of the Board's argument:

Plaintiff's lack of Board certification can bring Plaintiff's expertise into question from current and future employers as well as potential private-practice patients.

That is essentially an allegation that a lack of Board certification harms Morrison's reputation,

which does make it look like the *Phelps* case discussed next in the text. But Complaint ¶ 16(f)'s speculative locution ("can bring") is not shared by Morrison's clear allegations elsewhere in Complaint ¶ 16, charging other types of actual interference with her right to contract, that entitle her to survive Board's motion to dismiss.

text of Morrison's Title VII claim, at this point this Court must accept as true Morrison's allegations that the lack of Board certification significantly interferes with her ability to contract with employers. And that suffices to defeat this second branch of Board's argument.

Indeed, the situation as to the viability of Morrison's Section 1981 claim may be even more clear than the Title VII situation. *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 945 F.2d 906 (7th Cir.1991), a case involving a union's job referral service, teaches that to interpret Section 1981 as not covering a party that discriminatorily obstructs another's right to contract would (*id.* at 914):

> shorten[ ] the reach of the statute and prevent[ ] the Reconstruction-era civil rights remedy from being used to impose liability on intermediaries who erect insurmountable barriers to the formation of contracts.

*Daniels, id.* (emphasis added) therefore held that a race-based impediment to the formation of employment relationships is actionable under Section 1981:

> Unfortunately for plaintiff, the referral system did not increase the availability of his job opportunities to overcome the entrenched discrimination in the industry, but instead was infected with discrimination so that the referral system *erected substantial barriers* to plaintiff's ability to enter into contracts with employers. This kind of *race-based impediment* to contract formation constitutes exactly the sort of racially discriminatory interference with the right to contract that remains actionable under § 1981.[16]

Morrison has alleged that Board has placed the same sort of race-based impediment between her and future job opportunities by denying her Board certification.

Board counters that it does not have the same sort of ability to interfere with Morrison's future job prospects as in *Daniels*, where the union's job referral service was described as the "necessary intermediary and conduit connecting job opportunities to job referrals" (*id.* at 915). Instead, Board argues that it is more like (*id.*) an "unrelated third party whose interference with the contract bears an attenuated or haphazard connection to contracting" between Morrison and future employers.

But again that argument is at odds with the Complaint's allegations that this Court must accept as gospel for Rule 12(b)(6) purposes. Morrison alleges that Board certification is a prerequisite to her ability to contract for at least a significant part of her future employment as a psychiatrist, and that must be taken as true at this stage of the litigation.

### Conclusion

Although Morrison's ability to deliver as advertised is something that remains to be seen in the future, Rule 12(b)(6) motions are not designed to test the ultimate provability of a plaintiff's claims. At this pleading stage it cannot be said that "it appears beyond doubt that [Morrison] can prove no set of facts in support of [her] claim which would entitle [her] to relief" (*Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). Board's motion must be and is denied.

---

**16.** [Footnote by this Court] This last reference to what "remains actionable" reflected a distinction between *Daniels* and *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), which had substantially limited the claims that could be brought under Section 1981. That of course led to the congressional overruling of *Patterson* by the Civil Rights Act of 1991 (see *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1059 (7th Cir.1994)). But in a sense, the very fact that *Daniels* came out the way it did despite the limitations then imposed by *Patterson* adds weight to Morrison's position here.