# UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

ORLANDO L. HARRIS,

     Plaintiff,

and

SERVICE PROFESSIONALS, INC.,

     Plaintiff - Appellant,

v.

ALLSTATE INSURANCE CO.,

     Defendant - Appellee.

No. 01-6226

## ORDER

Filed November 26, 2002

Before **SEYMOUR**, **ALDISERT**,[*] and **EBEL**, Circuit Judges.

Appellants' petition for rehearing is denied.

The petition for rehearing en banc was transmitted to all of the judges of the court

---

[*]The Honorable Ruggero J. Aldisert, Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

who are in regular active service. As no member of the panel and no judge in regular active service on the court requested that the court be polled, that petition is also denied.

The panel has amended the opinion filed August 15, 2002. A copy of the opinion, with amendments to paragraph 21 and footnote 3, is attached to this order.

Entered for the Court
PATRICK FISHER, Clerk of Court


by: /s/ Opal Carter
      Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 15 2002**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ORLANDO L. HARRIS,

      Plaintiff,

and

SERVICE PROFESSIONALS, INC.,

      Plaintiff - Appellant,

v.

ALLSTATE INSURANCE CO.,

      Defendant - Appellee.

No. 01-6226

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-99-987-M)**

---

Mark Hammons, Hammons & Associates, Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Jefferson I. Rust (Jim T. Priest with him on the brief), McKinney & Stringer, P.C., Oklahoma City, Oklahoma, for Defendant-Appellee.

---

Before **SEYMOUR**, **ALDISERT**,[*] and **EBEL**, Circuit Judges.

---

[*]The Honorable Ruggero J. Aldisert, Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

**EBEL**, Circuit Judge.

Plaintiff-appellant Service Professionals, Inc. ("SPI") is a minority-owned business. Defendant-appellee Allstate Insurance Company maintains a list of vendors to which it refers its insureds for repair work. SPI was on this list, but allegedly received a disproportionately low number of the referrals. SPI filed the present suit alleging that Allstate's referral practices amounted to racial discrimination in violation of 42 U.S.C. § 1981. The district court granted Allstate's motion for summary judgment on all claims, and we **AFFIRM**.

## BACKGROUND

SPI is an African-American owned business that repairs and cleans smoke, fire, and water damage to property in Oklahoma City. In 1992, Allstate established a program it called the Quality Vendor Procedure ("QVP"). Under the QVP program, Allstate maintained a list of approved vendors of emergency repair services. SPI was included on the list of approved vendors. When one of Allstate's insureds needed a particular emergency repair service, Allstate would allow the insured to choose from the QVP vendors who provided that service. (Although insureds were not obligated to use QVP vendors for their repairs, Allstate encouraged their use by guaranteeing the work of QVP

vendors.)  SPI alleges that insureds rarely had a preference and that in such circumstances

Allstate would select the vendor.

SPI asserts that Allstate "promise[d] . . . to provide business to its QVP vendors."

In response, Allstate counters with evidence that its QVP vendor form, filled out by SPI,

stated that "Allstate personnel will utilize the [QVP] in such a way as to maximize

customer service.  We have no obligation to refer customers to this particular vendor."  In

his deposition, SPI co-owner Orlando Harris admitted having filled out this form, but

stated without elaboration that "they told me that it was on a rotating basis," apparently

meaning that Allstate told him that, when insureds expressed no vendor preference,

Allstate would rotate which vendor it chose for the insured.

The same QVP form also stated:

> The following is a record of quotations which have been received from this vendor.  It is not a contract or agreement of any kind between this vendor and Allstate.  The only agreement in effect between Allstate and this vendor is that if and when this vendor performs work for which Allstate is responsible, it will follow the procedures outlined in Section II below.

Section II established standards that the vendor "will comply with" for service, billing,

and recordkeeping.

The district court viewed SPI's complaint as asserting two distinct § 1981 claims.

The first was that Allstate's delay in adding SPI to the QVP program amounted to a

racially discriminatory refusal to contract under § 1981 ("failure to contract claim").  On

appeal, SPI disavows any intention to have asserted such a claim.  The second was that

Allstate's failure to refer insureds to SPI amounted to a discriminatory referral practice motivated by racial animus and/or desire to retaliate against SPI for alleging racial discrimination ("discriminatory referral claim"). As discussed below, the discriminatory referral claim itself is premised on two distinct theories: first, that Allstate was contractually obligated to refer a certain fraction of insureds to SPI, and Allstate's failure to fulfill its post-formation contractual obligations based on discriminatory motives violated § 1981(b); and second, that even absent contractual obligation, Allstate nonetheless was legally obligated under § 1981(a) to administer its referral program free of racial bias, and that Allstate's discriminatory refusal to give referrals to SPI precluded SPI from forming contracts with Allstate's insureds.

## DISCUSSION

*I.*     *Standard of Review*

We have jurisdiction under 28 U.S.C. § 1291. "We review a district court's grant of summary judgment de novo, applying the same standard as the district court." Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). A party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). For

- 4 -

purposes of summary judgment, we view the evidence in the light most favorable to the non-moving party. Simms, 165 F.3d at 1326. If the movant has shown the absence of a genuine issue of material fact, the nonmovant cannot rest upon his or her pleadings, but must bring forward specific facts sufficient to permit a reasonable jury to find in favor of the nonmovant on that issue. Id.

## II.    *Statute of Limitations*

Before reaching the merits of SPI's claims, we must determine whether any of the claims are time-barred. There are two issues to be resolved in the statute of limitations inquiry: first, whether the statute of limitations applicable to each of SPI's claims under § 1981 is Oklahoma's two-year period or a federal four-year period; and second, if the applicable limitations period is two years, whether some or all of SPI's § 1981 claims were untimely filed. The district court concluded that the applicable limitations period was two years. It further concluded that, while SPI's failure-to-contract claim arising from Allstate's alleged delay in adding SPI to the QVP was untimely (which SPI does not

challenge on appeal), SPI's discriminatory referral claims arising from Allstate's alleged failure to refer business to SPI once SPI had been added to the QVP were timely.

Section 1981 originally was enacted in 1870, providing in relevant part that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts." The Supreme Court in Patterson v. McLean Credit Union, 491 U.S. 164 (1989), held that § 1981 did not apply to an employer's post-formation conduct. Id. at 177 ("[T]he right to make contracts does not extend . . . to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." (emphasis added)); id. at 177-78 ("The right to enforce contracts does not . . . extend beyond conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights." (emphasis added)).

However, the Civil Rights Act of 1991 amended § 1981, redesignating the original text as § 1981(a) and adding subsections (b) and (c). Subsection (b), effectively reversing Patterson, provides, "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Subsection (c) provides that § 1981 applies to discrimination by nongovernmental as well as governmental actors.

In short, then, Patterson held that present § 1981(a) provides no cause of action as

to an employer's post-formation conduct.  The Civil Rights Act of 1991, codified at § 1981(b) and (c), essentially created a new cause of action to challenge an employer's discriminatory post-formation conduct.

One of two statutes of limitations applies to SPI's § 1981 claims.  The district court concluded, and Allstate argues on appeal, that Oklahoma's analogous statute of limitations (two years) applies to all of SPI's claims.  See Goodman v. Lukens Steel Co., 482 U.S. 656, 660 (1987) (holding that federal courts applying § 1981 "should select the most appropriate or analogous state statute of limitations" because § 1981 does not contain its own statute of limitations).  SPI argues that 28 U.S.C. § 1658, enacted in 1990 (after Goodman), compels a different result as to the appropriate statute of limitations for its discriminatory referral claim.  Section 1658 provides that "[e]xcept as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section [December 1, 1990] may not be commenced later than 4 years after the cause of action accrues."

The question, then, is whether any of SPI's § 1981 claims amount to "a civil action arising under an Act of Congress enacted after" December 1, 1990.  We have explained that § 1658 "was intended to be 'applicable to legislation enacted after the effective date of this Act, which creates a cause of action but is silent as to the applicable limitations period.'"  Laurino v. Tate, 220 F.3d 1213, 1217-18 (10th Cir. 2000) (quoting H.R. Rep. No. 101-734, at 24 (1990)).  In the past, this circuit has applied the state's analogous

statute of limitations to § 1981 claims without discussing the potential applicability of § 1658.  See Thomas v. Denny's, Inc., 111 F.3d 1506, 1514 (10th Cir. 1997); Reynolds v. Sch. Dist. No. 1, Denver, Colo., 69 F.3d 1523, 1532 (10th Cir. 1995).

To decide whether § 1658's four-year statute of limitations applies to any of SPI's § 1981 claims, we must answer two subsidiary questions.  The first, and by far the more difficult, is whether § 1658 applies to any § 1981 claims.   The answer to this issue remains hotly debated among federal courts, but the district court assumed without deciding that § 1658 applied to § 1981(b) claims.  The second subsidiary question is whether, if § 1658 applies to some § 1981 claims, it applies to any of SPI's § 1981 claims (in other words, if § 1658 applies to § 1981(b) claims, whether any of SPI's § 1981 claims arise under § 1981(b) rather than § 1981(a)).  The district court held that SPI's claims "are based upon § 1981 as enacted in 1870, and not on the 1991 amendments," and thus that they are subject to Oklahoma's two-year statute of limitations.  We agree with the district court that § 1658 applies to § 1981(b) claims, but we conclude that the district court erred in ruling that none of SPI's claims arise under § 1981(b).

The federal courts have split in determining which statute of limitations applies to suits brought under the amended version of § 1981.  The Third Circuit has summarized the divergent approaches as follows:

Three distinct approaches are recognized in the existing case law:

[**The First Approach**] 1.  When an Act of Congress passed after December 1, 1990, creates a claim that did not previously exist, that claim "arises under

- 8 -

an Act of Congress enacted after" December 1, 1990, even though the new statute creates the new claim by amending a previously existing statute. This view of § 1658, when applied in the context of § 1981 of the Civil Rights Act of 1870, as amended by the Civil Rights Act of 1991, results in § 1981 claims based on the discriminatory termination of contracts being governed by the four-year federal limitations period, and all other claims based on § 1981 being governed by the state statute for personal injury claims. [FN1]

FN1. See, e.g., Miller v. Federal Express Corp., 56 F.Supp.2d 955, 965 (W.D. Tenn.1999).

[**The Second Approach**] 2. When an Act of Congress passed after December 1, 1990, amends a statute existing before that date in a manner that substantially alters its meaning, all claims accruing after the passage of the new statute "arise under an Act of Congress enacted after" December 1, 1990, without regard to whether an identical claim arising earlier could have been successfully pursued under the prior statute. This view of § 1658, when applied in the context of § 1981 of the Civil Rights Act of 1870, as amended by the Civil Rights Act of 1991, results in all § 1981 claims arising after the 1991 amendment being governed by the four year federal limitations period. [FN2]

FN2. See, e.g., Alexander v. Precision Machining, Inc., 990 F.Supp. 1304 (D. Kan.1997).

[**The Third Approach**] 3. When an Act of Congress passed after December 1, 1990, amends a statute existing before that date, as opposed to creating new law without reference to previously existing statutory language, all claims accruing after the passage of the amendment arise under an Act of Congress enacted before December 1, 1990, without regard to whether an identical claim arising earlier could have been successfully pursued under the prior statute. This view, when applied in the context of § 1981 of the Civil Rights Act of 1870, as amended by the Civil Rights Act of 1991, results in all § 1981 claims accruing after the passage of the 1991 amendments being governed by the state limitations period for personal injury claims. [FN3]

FN3. See, e.g., Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261 (M.D. Ala.1998).

Each of the foregoing interpretations is textually plausible.

Zubi v. AT&T Corp., 219 F.3d 220, 222 (3d Cir. 2000) (footnote omitted).

Two circuits have resolved the issue, both holding that § 1658 does not apply to any claims under § 1981, regardless of whether they fall under § 1981(a) or § 1981(b) – i.e., adopting what Zubi identifies as the third approach. See Madison v. IBP, Inc., 257 F.3d 780, 798 (8th Cir. 2001); Zubi, 219 F.3d at 223-26. One other circuit has acknowledged the issue but declined to resolve it. Taylor v. Ala. Intertribal Council Title IV, 261 F.3d 1032, 1033 (11th Cir. 2001) (per curiam).

A June 2001 district court decision counted approximately 25 district court decisions on the issue and concluded that the majority of district courts also have adopted the Zubi approach. Adams v. R.R. Donnelley & Sons, 149 F. Supp.2d 459, 463 (N.D. Ill. 2001). Compare, e.g., Campbell v. Nat'l R.R. Passenger Corp. (Amtrak), 163 F. Supp.2d 19, 25 (D.D.C. 2001) (following Zubi), and Coleman v. Shoney's, Inc., 145 F. Supp.2d 934, 937-38 (W.D. Tenn. 2001) (same), with Turner v. Nat'l R.R. Passenger Corp. (Amtrak), 181 F. Supp.2d 122, 130-31 (N.D.N.Y. 2002) (declining to follow Zubi), and Adams, 149 F. Supp.2d at 462-64 (same).

Here, the district court assumed without deciding that the first approach applied. On appeal, SPI argues that the first approach should apply, while Allstate argues that the third approach should apply. After reviewing the arguments offered by counsel and other courts in support of their positions on this issue, we agree with SPI that § 1658's four-year limitations period applies to § 1981 claims that were created by the Civil Rights Act

- 10 -

of 1991 (e.g., claims under § 1981(b)). The case for this position – i.e., Zubi's "first approach" – is most convincingly made by the district court's opinion in Adams, which we quote at length:

> [Section 1981] as [originally] written, protected just two rights: the right to make contracts, which "extend[ed] only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment," and the right to enforce contracts, which "embrace[d] protection of a legal process, and of a right of access to legal process, that will address and resolve contract-law claims without regard to race." Patterson v. McLean Credit Union, 491 U.S. 164, 176-77 (1989). The Civil Rights Act of 1991, which became law (i.e., was enacted) on November 21, 1991, revised § 1981 . . . . In other words, the version of § 1981 in the 1991 Act created new causes of action that were not cognizable under the pre-1991 version of the statute.
>
> . . . . The question for the Court is whether this well-settled proposition [historically applying state statutes of limitations to § 1981 actions] was altered by Congress' enactment on December 1, 1990 of 28 U.S.C. § 1658 . . . .
> Looking at the plain language of § 1658, this seems to this Court to be an easy question to answer, though judging by the panoply of ways in which the question has been framed and answered this is apparently a minority view. The Seventh Circuit has yet to address the question of whether § 1658 governs claims brought under the 1991 Act; in fact only one circuit court, the Third, has actually considered, analyzed and answered the question. In Zubi v. AT&T Corp., 219 F.3d 220, 225 (3rd Cir.2000) the court held that § 1658 applies "only when Congress establishes a new cause of action without reference to preexisting law. . . ." Thus, because Congress "chose to build upon a statutory text that has existed since 1870," the court held, "Zubi's civil action arises under an Act of Congress enacted before December 1, 1990, and is governed by New Jersey's two-year statute of limitations." Id. at 226. The Court cannot imagine how this is possible; in Patterson, the United States Supreme Court clearly held that claims such as those asserted by Zubi (discriminatory firing) did not arise under the pre-1991 version of § 1981. See Patterson, 491 U.S. at 177 ("the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established . . . ."). Rather, such claims can be made only by virtue of Congress' 1991 enactment of § 1981(b).
> . . . .

. . . . We think the [first approach] is the only one true to the language of the statute.

"[J]udicial inquiry into the applicability of [§ 1658] begins and ends with what [§ 1658] does say and with what [§ 1658] does not." Connecticut National Bank v. Germain, 503 U.S. 249, 254 (1992). Section 1658 applies to any "civil action arising under an Act of Congress enacted" after December 1, 1990. We see nothing ambiguous in this language, at least as it relates to the claims at issue in this lawsuit. First, although some courts have found otherwise, we do not think the statute's reference to "an Act of Congress enacted" is susceptible to more than one reasonable interpretation. "Enact" means "to make into law by authoritative act," Black's Law Dictionary 546 (7th ed.1999); thus every Act of Congress, whether it reflects a never-before considered subject or amends a previously existing statute, is "enacted." To the extent there could ever be any doubt about whether the Civil Rights Act of 1991 was "an Act of Congress" or whether it was "enacted," the language of the law itself should set the record straight. Congress specifically used both words in the law's preamble:

> An Act to amend the Civil Rights Act of 1964 to strengthen and improve Federal civil rights laws, to provide for damages in cases of intentional employment discrimination, to clarify provisions regarding disparate impact actions, and for other purposes.
>
> Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, . . .

Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071 (1991) (emphasis added).

Second, there is no question that "civil action" as used in § 1658 means "claim" or "cause of action." See David D. Siegal, The Statute of Limitations in Federal Practice, Including the New 'General' One in Federal Question Cases, 134 F.R.D. 481, 487 (1991). Finally, there is no question that "arising under" means "stemming from" or "originating in". See Black's Law Dictionary 102 (7th ed.1999).

In short, the meaning of § 1658 is quite simple: whenever Congress, after December 1990, passes legislation that creates a new cause of action, the

catch-all statute of limitations applies to that cause of action.  As applied to § 1981, claims that under Patterson could be brought under the pre-1991 version of § 1981 clearly arise under an Act of Congress that was enacted prior to § 1658's enactment date, and the catch-all statute does not apply to such claims.  Claims that Patterson said could not be brought under the pre-1991 version of § 1981, but which can be made only by virtue of § 1981(b), just as clearly arise under the Civil Rights Act of 1991, an Act of Congress enacted after § 1658.  Section 1658 applies to those claims.  Having concluded that the language of the statute is unambiguous, we need not consider the statute's legislative history.

The only other district judge in this Circuit who has addressed this issue concluded that § 1658 does not apply to any claims under § 1981, including claims given life by § 1981(b); it relied in part on legislative history that it read as indicating that Congress did not view the Civil Rights Act of 1991 as creating any new causes of action, but rather as "restoring" § 1981 to its proper scope following the Supreme Court's decision in Patterson.  This Court does not agree.  First, as indicated above, resort to legislative history is inappropriate where, as here, the language of the statute is unambiguous.  But more importantly, whatever label Congress chose to give to its enactment, it was not "restoring" § 1981, it was changing it.  "It is emphatically the province and duty of the judicial department to say what the law is," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), and in Patterson the Supreme Court determined not that § 1981 should be narrowed despite its original intent, but rather that the statute, as enacted in 1866, was never meant to reach certain forms of conduct.  Patterson, 491 U.S. at 176-77.  When Congress enacted § 1981(b), it thus undeniably created new causes of action, whether or not that is how it chose to label what it had done.

A number of courts have noted that our interpretation would result in courts applying two different statutes of limitations for every federal statute enacted prior to December 1, 1990 and amended thereafter to create new types of claims.  The answer to that is three-fold.  First, the Court has not been asked to decide whether § 1658 governs every post-1990 legislative amendment; the Court must decide only whether the statute governs the claims raised by these plaintiffs in this lawsuit.  Second, courts routinely apply different statutes of limitations to different claims, including different claims made within a single lawsuit.  And third, even if applying multiple statutes of limitations is inconvenient, that is what Congress has required, and the courts are not at liberty to second guess an unambiguous statute.

To summarize, the Court finds that 28 U.S.C. § 1658 is unambiguous and, by its terms, applies to all claims arising out of the Civil Rights Act of 1991, which was enacted after December 1, 1990, the date on which § 1658 was enacted. Section 1658, by its terms, does not apply to claims arising under the pre-1991 version of § 1981; these claims continue to be governed by the most analogous state law statute of limitations, here, Illinois' two-year personal injury statute of limitations.

Adams, 149 F. Supp.2d at 461-65 (citations omitted).

The question of whether § 1981(b) was "enacted" for purposes of § 1658, despite

its being labeled an "amendment," was also answered convincingly in the affirmative by

Judge Alito in his dissent in Zubi:

> The term "Act of Congress" [used in § 1658] means a law enacted in one of the ways prescribed by Article I, § 7 of the Constitution. Acts of Congress are published in the United States Statutes at Large, which constitute "legal evidence" of what the law provides. 1 U.S.C. § 112.
>
> . . . .
>
> [Section 1981] is not itself an Act of Congress; rather, it is a codification of two prior Acts. [FN9] Subsection (a) of § 1981 is a codification of Section 1977 of the Revised Statutes of 1874. [FN10] Until 1989, it was unsettled whether the phrase "make and enforce contracts" in this provision reached the discriminatory termination of a contractual relationship, but in Patterson v. McLean Credit Union, 491 U.S. 164 (1989), the Supreme Court held that this language did not apply to conduct occurring after the formation of a contract. "[T]he Patterson opinion finally decided what § 1981 had always meant." Rivers v. Roadway Express, 511 U.S. 298, 313 n. 12 (1994).
>
> FN9. Thus, it is not itself the law but only "prima facie" evidence of the law, 1 U.S.C. § 204(a). See United States National Bank of Oregon v. Independent Insurance Agents of America, Inc., 508 U.S. 439, 449 & n. 4 (1993).
>
> FN10. Subsection (a) may be traced to Section 16 of the Civil Rights Act of 1870 . . . . In 1874, however, Congress enacted into law the Revised Statutes of 1874, "a massive revision, reorganization, and reenactment of all statutes

- 14 -

in effect at the time, accompanied by a simultaneous repeal of all prior ones." United States National Bank of Oregon, 508 U.S. at 449. The relevant sections of the Civil Rights Acts of 1866 and 1870 were thus repealed and then re-enacted as section 1977 of the Revised Statutes of 1874. See Runyon v. McCrary, 427 U.S. 160, 168 n. 8 (1976).

When the U.S. Code was compiled, the provisions of Rev. Stat. § 1977 were codified at 42 U.S.C. § 1981. In 1991, when Rev. Stat. § 1977 was amended, the amendments were also, of course, reflected in 42 U.S.C. § 1981. Section 1981 of the United States Code has never itself been enacted as positive law, though, and it is thus only "prima facie" evidence of the provisions of Rev. Stat. § 1977 as amended by the Civil Rights Act of 1991. See 1 U.S.C. § 204(a). Cf. United States Nat'l Bank of Oregon v. Independent Insurance Agents of America, Inc., 508 U.S. 439, 448-49 & n. 4 (1993).

In 1991, shortly after enacting 28 U.S.C. § 1658, Congress broadened the scope of this provision. Section 101 of the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, amended Section 1977 of the Revised Statutes and defined the phrase "make and enforce contracts" to include the "termination of contracts and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." This new provision is codified as 42 U.S.C. § 1981(b). Thus, as a result of the 1991 Act, a plaintiff may now sue under § 1981 for discriminatory termination of employment – and that is precisely what Zubi did here.

. . . .

It is beyond dispute that the Civil Rights Act of 1991 qualifies as an "Act of Congress" in the sense in which that term is invariably used. We would have to use the term "Act of Congress" in § 1658 in an entirely idiosyncratic way in order to reach a contrary conclusion.

219 F.3d at 228, 228-30 (Alito, J., dissenting) (parallel citations omitted).

For the reasons set forth by the district court in Adams and by Judge Alito in his Zubi dissent, we hold that § 1658 applies to claims brought under § 1981(b), but not to claims brought under § 1981(a). Cf. Laurino, 220 F.3d at 1217-18 (holding that § 1658

did not apply to § 1983 claims because post-1990 amendment to § 1983 "did not create a cause of action").

The next matter to resolve is identifying which, if any, of SPI's claims arise under § 1981(a), and which, if any, arise under § 1981(b). The amended complaint does not set forth distinct causes of action, but includes the general allegation that SPI has "been denied contracts directly with Allstate and has been denied referrals by Allstate in any fashion equal or comparable to non-minority vendors." On appeal, SPI disclaims any intent to bring claims based on Allstate's conduct prior to entering into the QVP agreements with SPI, explaining that "[w]hile [it] claimed (as part of its background facts) that it had been denied entry into the QVP program until 1996 or 1997, SPI expressly claimed that discrimination continued after SPI was placed on the QVP program." Characterizing its suit as one for post-formation conduct, SPI argues on appeal that § 1658's four-year limitations period governs the suit.

While there is no indication that any part of SPI's suit is based on conduct occurring prior to the formation of SPI's contract with Allstate, SPI does challenge Allstate's conduct vis-a-vis SPI's prospective contracts with Allstate's insureds. SPI couches this claim in the alternative. First, assuming that Allstate has a contractual obligation to provide a pro rata share of referrals to SPI, SPI claims that Allstate's discriminatory refusal to comply with such contractual obligations violates § 1981(b). Second, assuming that Allstate's QVP program did not rise to the level of a contractual

- 16 -

obligation to give referrals to SPI, SPI claims that the discriminatory referral of business would be actionable under § 1981(a) because Allstate's allegedly discriminatory referral practice impeded SPI's ability to make contracts with Allstate's insureds.

The district court ruled that all of SPI's "claims are based upon § 1981 as enacted in 1870, and not on the 1991 amendments," and thus "remain subject to Oklahoma's two-year statute of limitations." For the reasons just discussed, this ruling is correct as applied to SPI's claims that do not rely on the existence of a contract between SPI and Allstate, but not as applied to the claims grounded in such a contract. The former claims are properly viewed as raising pre-formation conduct, while the latter raise post-formation conduct.[1] Oklahoma's two-year limitations period applies to the pre-formation conduct claims, which arise under § 1981(a), but § 1658's four-year limitations period applies to the post-formation conduct claims, which arise under § 1981(b).

The parties do not dispute that the discriminatory referral claims arose less than four years prior to the filing of suit. Therefore, the discriminatory referral claim based upon the alleged discriminatory performance by Allstate of its contract with SPI is timely under § 1658. The discriminatory referral claim not based on a contract between SPI and

---

[1] These "pre-formation" and "post-formation" labels do not refer to the chronology of the conduct underlying the claims, as both claims arise from precisely the same conduct – i.e., Allstate's failure to provide SPI with referrals. Rather, the labels denote the legal basis of the claims. The "post-formation" claim is grounded in Allstate's failure to carry out its existing contractual obligations with SPI, and the "pre-formation" claim is grounded in Allstate's failure to allow SPI to form contracts with the insureds without regard to any alleged contract between SPI and Allstate.

Allstate is untimely to the extent the referrals occurred more than two years before the suit's July 9, 1999 filing date.[2]

III.    *Discriminatory Referrals as a Violation of SPI's Contract Rights*

The district court concluded that Allstate was entitled to summary judgment on SPI's claim that the insurer violated SPI's contract rights in a discriminatory manner by giving it fewer referrals than it gave to non-minority participants in the QVP program. The court found that SPI "has failed to produce sufficient evidence of a contractual obligation between SPI and Allstate for Allstate to refer SPI a specific number or proportionate share of Allstate's mitigation claims each year." We agree.

SPI co-owner Orlando Harris gave the following deposition testimony:

> Q       This vendor agreement that you – that you say that you signed with Allstate, did it promise you a certain number of referrals per year?
>
> A       No, sir.
>
> Q       Did it promise you to do any specific type of work?
>
> A       No, sir.

---

[2] SPI is not entitled to pursue claims based on referrals occurring outside the limitations period, as the continuing violation theory is not applicable to § 1981 claims. Thomas, 111 F.3d at 1514. Determining the extent of the referrals occurring within the limitations period is unnecessary in light of our disposition of the claims on their merits, discussed below.

Q       Did it promise you any specific dollar volume of business?

A       No, sir.

Q       Okay. In fact, did it promise you any business at all?

A       I would say it did.

Q       All right. What business did it promise you?

A       It promised me that when they have a – way I'm taking it and reading it, when I have a fire, flood, or water, or smoke in one our insureds, you will be one of the vendors that we would recommend – that we would not recommend, but we would dispatch to the customer's home. So me, thinking that – hey, if I'm – I don't care if I was the tenth one. I'm thinking every tenth claim, I'm getting a claim from Allstate.

Q       Did they promise you that you would get every other – promise you that it would be an equal rotation?

A       The word "promise" – they told me that it was on a rotating basis.

Q       Did anyone ever promise you – they said – you know there was three vendors at that time; right?

A       (Witness nods head up and down).

Q       Did anyone ever say you will get every third call?

A       No.

Q       Okay.

A       That's my stupidity of what I expected, when you say a rotating basis.

SPI argues that this testimony was sufficient to foreclose summary judgment. It argues that, viewed in the light in the most favorable to SPI, "[a] jury may fairly infer, as did Mr. Harris, that a promise of referrals on a rotating basis, is a promise of <u>even</u> referrals."

The parol evidence rule renders Harris's testimony ineffective to contradict the QVP form's written language. Because this is a federal question case, "federal law governs the applicability of the parol evidence rule." <u>United States v. Jacobs</u>, 304 F. Supp. 613, 619 (S.D.N.Y. 1969). Under the federal common law's version of the parol evidence rule, "[e]vidence of a collateral agreement may be admitted if (1) it does not contradict a clear and unambiguous provision of a written agreement, and (2) the parties did not intend the written agreement to be the complete and exclusive statement of their agreement." <u>United States v. Triple A Mach. Shop, Inc.</u>, 857 F.2d 579, 585 (9th Cir. 1988); <u>see also</u> <u>United States v. Waterman S.S. Corp.</u>, 397 F.2d 577, 579 (5th Cir. 1968) ("Where the terms of the contract are unambiguous[,] the determination of its meaning is a question of law and should be decided without resort to extrinsic evidence.").

As noted above, the QVP form signed by SPI stated, "We [Allstate] have no obligation to refer customers to this particular vendor." SPI may not negate this unambiguous provision with Harris's testimony that someone at Allstate promised him that referrals would be rotated among the vendors. Because the terms of the QVP form govern, SPI's claim based on a contractual right to referrals fails.

*IV.* *Discriminatory Referrals Apart from Contract*

SPI argues that, even if its contract-based claim fails, its suit should have survived summary judgment based on a pure discriminatory referral theory. That is, SPI argues that § 1981 bars a party (Allstate) from discriminating on the basis of race when it makes referrals which lead to contracts between the referred party (SPI) and third parties (Allstate's insureds).[3] In light of the standards set forth by courts addressing this theory of liability, the district court found that the evidence in this case did not support such a § 1981 claim, and we agree.

In Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262 (10th Cir. 1989), the defendant newspaper ran a story about Phelps. Phelps sued the newspaper, alleging, inter alia, that the story (which Phelps viewed as hostile) "interfered with his 'prospective business opportunities'" in violation of § 1981. Id. at 1267. We rejected this claim with the following explanation:

> [W]e find that vague and conclusory allegation insufficient to state a deprivation of the right to make and enforce contracts that is protected by Section 1981. Plaintiff has the same right as others to enter into contracts with those who wish to contract with him. Even if the state [sic] has defamed him and thus arguably made him less attractive to some who otherwise might want to contract with him, the defamation does not deny him the basic right to contract.

---

[3] As discussed above, claims based on discriminatory referrals occurring more than two years before suit was filed are time-barred.

Id. (citation to Patterson omitted).  Although Phelps pre-dates the Civil Rights Act of 1991, we recently have cited Phelps for the proposition that "a § 1981 claim for interference with the right to make and enforce a contract must involve the actual loss of a contract interest, not merely the possible loss of future contract opportunities." Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1104 (10th Cir. 2001) (internal quotation marks omitted).

Two years after Phelps, the Seventh Circuit decided Daniels v. Pipefitters' Ass'n Local Union No. 597, 945 F.2d 906 (7th Cir. 1991).  The defendant union operated a job referral service pursuant to a collective bargaining agreement.  Employers who needed welders or pipefitters would call the union to inform the union of its labor needs, and the union would refer the members.  The "job referral system was an important source of jobs.  Some contractors, including . . . the largest contractor in the area, made a practice of hiring only those workers referred from the" union.  Id. at 911.  Because "Local 597's job referral service was the primary mechanism through which contractors hired union employees," the court concluded that "[i]n essence, no referral meant no job and no opportunity for union members to enter into employment contracts with employers."  Id. at 914.  Daniels was an African-American member of Local 597 who alleged that the union racially discriminated against its African-American members in making referrals in violation of § 1981.

The union appealed from a jury verdict in Daniels's favor, arguing that it did not interfere with Daniels's right to make contracts because its "referral service was nothing more than a mechanism to encourage union members to find employment." Id. Alternatively, the defendant argued that "[o]bstructing someone's right to contract with others is . . . unactionable under § 1981." Id. (emphasis added). The court rejected both of these arguments:

> This kind of race-based impediment to contract formation constitutes exactly the sort of racially discriminatory interference with the right to contract that remains actionable under § 1981. To hold otherwise would impose a sort of § 1981 privity of contract requirement that would effectively protect third parties such as labor unions from § 1981 liability.
>
> . . . . Local 597 is not an unrelated third party whose interference with the contract bears an attenuated or haphazard connection to contracting between its members and the employer. On the contrary, Local 597 is the necessary intermediary and conduit connecting job opportunities to job referrals.

Id. at 914-15.

Three district court opinions also offer insight on this issue. In Vakharia v. Swedish Covenant Hospital, 765 F. Supp. 461 (N.D. Ill. 1991), Vakharia was a doctor who alleged that the defendant hospital violated § 1981 when it interfered with her ability to contract with patients by limiting the number of patients she could see, removing her from a "first call" schedule, and ultimately suspending her. Id. at 471. The court stated that § 1981 prohibits "discriminatory interference by a third party with the exercise of the right to make contracts." Id. The court concluded that the alleged interferences (e.g.,

limiting the number of patients) "all seem to fall easily within the rubric of proscribed conduct" and allowed Vakharia's § 1981 claim to proceed.  Id. at 471-72.

In Morrison v. American Board of Psychiatry & Neurology, Inc., 908 F. Supp. 582 (N.D. Ill. 1996), the defendant board was responsible for certifying psychiatrists such as Morrison.  Morrison alleged that certification "is a large, if not the primary factor which patients consider and many hospitals require in choosing or hiring a physician."  Id. at 583 (internal quotation marks omitted).  The board argued that this allegation was insufficient because "Morrison has not alleged that Board has interfered with her efforts to make a specific contract, as contrasted with assertions of 'lost economic opportunities' that are too speculative to be recognized under Section 1981," and because "Board does not have the kind of 'active control' over Morrison's ability to contract that is needed to call Section 1981 into play."  Id. at 587.  The court rejected these arguments and upheld Morrison's claim.  "Morrison has alleged more than abstract or pie-in-the-sky lost economic opportunities.  She says expressly that without Board certification she will suffer the identifiable harm of being unable to contract with the many medical facilities that require Board certification."  Id. at 588.  The court distinguished Phelps as involving a "speculative assertion" that "contrasts sharply with the Morrison allegations that . . . many medical facilities and private patients make Board certification a prerequisite to employment."  Id.

Finally, in Shirkey v. Eastwind Community Development Corp., 941 F. Supp. 567 (D. Md. 1996), Shirkey challenged his non-hiring for a position under § 1981. In addition to suing the non-profit employer, he also sued the church organization that ran the non-profit and allegedly promulgated the discriminatory policy. The church argued that it could not be sued under § 1981 because it was not Shirkey's employer. Citing Daniels and Vakharia, the court noted that interference with third-party contracting is actionable under § 1981. Id. at 573. Because the church formulated the policy that resulted in Shirkey's non-hiring, it "cannot credibly claim an attenuated and distant relationship between" its actions and the hiring decision. Id. at 573-74.

In the case at hand, the district court rejected SPI's argument on the following basis:

[T]he Court finds Daniels [discussed above] to be inapplicable.

In Daniels, the union's job referral service was described as the "necessary intermediary and conduit connecting job opportunities to job referrals." In this case, there has been no evidence presented that being placed on the QVP list was a necessary requirement for SPI in order to enter into contracts with Allstate's customers/insureds. In fact, plaintiff admits that from 1990 to the present, it received approximately two (2) to ten (10) referrals per year from the Allstate claims office. This statistic includes the years prior to 1996, when it is undisputed that plaintiff was not on the QVP list.

Accordingly, the court finds the cases offered in support of plaintiff's assertion that its claim is still actionable even without the existence of a contract or contractual right, to be factually and materially distinguishable. See Daniels, 94 F.2d at 914 (finding that "in essence, no referral meant no job and no opportunity for union members to enter into employment contracts with employers"); Morrison v. Am. Bd. of Psychiatry & Neurology, Inc., 908 F. Supp. 582 (N.D. Ill. 1996) (section 1981 claim was supported by allegation

- 25 -

that Board discriminated against plaintiff based on her race by denying board certification which was required in order to practice psychiatry with many medical facilities); <u>Vakharia</u>, 765 F.Supp. at 472 (finding that plaintiff was only able to obtain patients through assignment by Hospital and referral by staff surgeons). Thus, viewing the facts and evidence in the light most favorable to plaintiff, the Court finds that Allstate was not in a position to interfere with plaintiff's ability to enter into new contracts as would support a claim under § 1981.

We agree with the district court that SPI has failed to present a claim under § 1981. Relief is available under § 1981 where a party discriminatorily uses its authority to preclude an individual from securing a contract with a third party. However, this requires the individual to show that the party both possessed sufficient authority to significantly interfere with the individual's ability to obtain contracts with third parties, and that the party actually exercised that authority to the individual's detriment. We believe SPI falls short in both respects. SPI's complaint is only that it did not always receive the <u>benefit</u> of referrals by Allstate, but § 1981 does not support such a claim.

**CONCLUSION**

The district court's grant of summary judgment in favor of Allstate is **AFFIRMED**.