**Mark HERNANDEZ, Plaintiff,**

v.

**DATA SYSTEMS INTERNATIONAL, INC., Defendant.**

#### No. 02–2193–JWL.

United States District Court, D. Kansas.

June 10, 2003.

Frank B. W. McCollum, Stacy M. Bunck, McCollum & Parks, L.C., Kansas City, MO, for Plaintiff.

Carole K. DeWald, Shirley E. Goza, Stacey A. Campbell, Tina L. Harris, William C. Martucci, Shook, Hardy & Bacon, L.L.P., Kansas City, MO, for Defendant.

Donna K. McElroy, Cox & Smith, Inc., San Antonio, TX, for Sirius Computer Solutions, Inc.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Mark Hernandez filed suit against defendant Data Systems International, Inc. ("DSI") alleging that defendant paid him less and imposed more work assignments than similarly situated non-Hispanic employees, failed to promote him on the basis of his race, terminated his employment based on his race, retaliated against him for filing a discrimination complaint, and subjected him to a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981,

and the Kansas Act Against Discrimination, K.S.A. § 44–1001 et seq.

This matter is presently before the court on defendant's motion for summary judgment (Doc. 67). As set forth in more detail below, defendant's motion for summary judgment is granted in part and denied in part. Specifically, defendant's motion is granted as to the Title VII claims and the Section 1981 claims that arose prior to the applicable limitations period. The court further grants summary judgment as to two of the three retaliatory discrimination claims and the hostile work environment claim. The court denies summary judgment with respect to plaintiff's discrimination claims founded on his compensation, job assignments, failure to promote, and termination. The court also denies summary judgment as to his claim of retaliatory discharge.

## STATEMENT OF MATERIAL FACTS[1]

Plaintiff Mark Hernandez is a male of Hispanic descent. On July 5, 1994, Data Systems International, Inc. ("DSI") hired Mr. Hernandez as a marketing representative. DSI retained Mr. Hernandez for nearly seven years. Throughout this time, DSI did not adopt a formal policy for performing employee evaluations. Other than a written comment from Leo Harris indicating that Mr. Hernandez was a top performer, DSI has no written evaluations of his performance. Moreover, DSI never indicated that his skills or performance were deficient or recommended improvement in any particular area of his job performance.

During his second year of employment, Mr. Hernandez brought in the SYSCO account, DSI's largest sales account, and DSI changed his compensation plan. Mr. Hernandez felt that his compensation package was inadequate. Thus, in June of 1996, he told his supervisor at the time, Gary Swanson, that his compensation structure was not comparable to similarly situated employees. Mr. Swanson suggested he talk with upper management and Mr. Hernandez subsequently discussed the matter with Ken Saathoff. Mr. Saathoff indicated that management felt his efforts did not justify paying him as much as the other Sales Representatives. Mr. Hernandez felt that it was unfair for his compensation plan to be different because of the SYSCO account.

In fiscal year 1998 (June 1, 1997 through May 30, 1998), Mr. Hernandez's title changed to account executive. His compensation included a base salary of $48,000, a 5% gross margin commission on the first $4 million in sales and a 10% gross margin commission on sales thereafter. This commission rate was lower than other similarly situated employees.

In fiscal year 1999 (June 1, 1998 through May 30, 1999), DSI promoted Mr. Hernandez and others to the position of Regional Manager. His total compensation included a base salary of $60,000, a 2% regional operating margin commission and a 5% personal gross margin commission. Sales commissions and bonuses, instead of base salary, constituted the greatest percentage of total compensation. That fiscal year, Mr. Hernandez had the lowest regional operating margin commission rate and the highest quotas of any Regional Manager. In June of 1998 and June of 1999, other similarly situated employees earned revenue based on a higher rate of commission than Mr. Hernandez. Moreover, Mr. Hernandez was the only Regional Manager required to personally service a large client account. Thus, Mr. Hernandez had

---

1. The following facts are uncontroverted or construed in the light most favorable to Mr. Hernandez, the non-moving party. *See, e.g.,* *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (setting forth summary judgment standards).

all of the responsibilities of other Regional Managers, including hiring, opening new offices, introducing DSI into new markets, and carrying the quota and responsibility for the success of his region. At the same time, he performed the same duties as a Sales Representative by personally servicing the SYSCO account. DSI did not separately compensate him for these additional duties.

In fiscal year 2000 (June 1, 1999 through May 30, 2000), Mr. Hernandez's compensation included a base salary of $72,000, which was the second highest base salary among Regional Managers. Mr. Hernandez also received a 5% regional operating margin commission. All other Regional Managers had a 5% regional operating margin commission. DSI also imposed the second highest regional gross margin quota ($4.1 million) and the highest regional operating margin quota ($2.6 million) on Mr. Hernandez. Moreover, he was the only Regional Manager with a personal gross margin quota. As in fiscal year 1999, he was required to service the SYSCO account in addition to his Regional Manager duties, without additional compensation.

For the stub year (which ran from June 1, 2000 through December 31, 2000), Mr. Hernandez's total compensation included an annual base salary of $108,000 and a 5% regional operating margin commission. The other Regional Managers had the same base salary (or lower) and the same regional operating margin commission, except for Mr. Jurczak, whose base salary was $120,000 and whose regional operating margin commission was 8%. However, from June of 2000 through December of 2000, DSI required Mr. Hernandez to manage both his Southwest Region and the West Region. This duty was imposed in addition to his ongoing duty to service the SYSCO account. DSI did not compensate Mr. Hernandez for this additional duty.

Commencing January 1, 2001, DSI began operating under a new structure with one sales force for services, software, and hardware. Previously, there were three separate sales divisions: one for services, one for software, and one for hardware. As part of the restructuring, all DSI Regional Managers, including Mr. Hernandez, were promoted to Regional Directors. DSI held each Regional Director responsible for the performance of his or her region. After his promotion to Regional Director, he was on an incentive compensation plan that did not include a commission component. All Regional Directors were on the same incentive compensation plan. One month into the restructuring, on January 27, 2001, DSI increased Mr. Hernandez's base salary to $145,000 for calender year 2001. For the four months of 2001 preceding Mr. Hernandez's termination, his wages totaled just over $84,700.

*Request for Promotion*

In 2000, DSI was planning to restructure its organization. As part of this restructuring, Mr. Hernandez learned, in March of 2000, that the company contemplated creating a new position, the Vice President of Sales. On April 19, 2000, Mr. Hernandez requested a promotion to Vice President of Sales in a letter to Bill Conwell, Senior Vice President of Sales and Marketing. Mr. Hernandez and Mr. Conwell met to discuss the request. During the meeting, Mr. Hernandez explained why he thought he was qualified for the position. Mr. Conwell agreed that he was qualified, but explained that Ken Saathoff and Mike McGraw would make the final decision.

In late 2000, DSI approved the positions of Vice President of Sales and Director of Strategic Alliances. By January of 2001,

DSI had committed budget dollars to the new positions. DSI never informed Mr. Hernandez he would not be promoted to the new position. He first realized that he would not be promoted when DSI terminated his employment on April 30, 2001.

### Reduction in Force

DSI lost approximately $2 million in January and February of 2001. In response, DSI decided to reduce its work force to minimize the financial losses of the company. DSI instructed the senior vice president of each respective business area to select employees for termination. Mr. Conwell selected Mr. Hernandez for termination and Mr. McGraw and Mr. Baldwin approved the selection. As discussed herein, DSI proffers a variety of bases for selecting Mr. Hernandez.

At the time DSI was implementing its reduction in force, Mr. Hernandez was one of six Regional Managers (Bob Cate, Scott Kephart, Mike Jurczak, David Leyton and Mike Murphy). From January 1, 2001 through April 30, 2001, three regions were unprofitable. The managers of those regions included Mr. Hernandez, Mr. Kephart and Mr. Murphy. DSI selected Mr. Hernandez and Mr. Kephart for termination, but offered Mr. Murphy another position within the company. The Regional Director position was not eliminated, but DSI consolidated its regions and retained only three Regional Directors (Mr. Jurczak, Mr. Cate, and Mr. Leyton). Mr. Hernandez's Southwest Region was merged into the Central Region.

Denia Milne, Vice President of Human Resources, informed Mr. Hernandez that he was being terminated because DSI decided to "get out of the commodity hardware reselling business."

### Retaliation

On the morning of April 19, 2001, Mr. John Rockeman, Vice President of Solutions Development, called Mr. Hernandez a "stupid spic." Denia Milne, Vice President of Human Resources, overheard the racial slur. Mr. Hernandez complained to Ms. Milne regarding Mr. Rockeman's comment. He told her that it was inappropriate for Mr. Rockeman to use such derogatory language. Later that day, Ms. Milne apologized to Mr. Hernandez on behalf of DSI and told him that she would take care of the situation.

That same day, Ms. Milne told Mr. Rockeman that his behavior was inappropriate. Ms. Milne informed Mark Baldwin, DSI's General Counsel and Chief Financial Officer about the incident. In response, Mr. Baldwin asked if she had followed up on the incident. Ms. Milne stated that she spoke to Mr. Hernandez. Ms. Milne also informed Bill Conwell, Senior Vice President of Sales, of the incident. Mr. Conwell asked if he should pursue any particular course of action. Ms. Milne told him that she had already cautioned Mr. Rockeman about the use of racial slurs in the workplace.

Within two weeks from the date of Mr. Hernandez's complaint, DSI (acting through Mr. Baldwin, Mr. Conwell, and Mr. McGraw) terminated his employment on April 30, 2001. In May of 2001, Mr. McGraw, President and Chief Executive Officer of DSI, advised Mr. Najim, President of Sirius, not to hire Mr. Hernandez. Sirius, however, hired Mr. Hernandez as its Regional Manager on May 15, 2001.

After Sirius hired Mr. Hernandez as its Regional Manager, DSI filed a lawsuit on June 11, 2001, asserting tortious interference with business expectancy, unfair competition and breach of contract claims against Mr. Hernandez, Sirius and other defendants. At the time the complaint was filed, DSI had not yet located a signed copy of its non-compete agreement with Mr. Hernandez. The parties settled the claim on October 1, 2001.

*Racial Harassment*

At a management meeting in 1998, Mr. Hernandez overheard John Rockeman, Vice President of Solutions Development, state: "I'm tired of talking to that bitch. She's just a woman. She needs to get out of my face." Mr. Rockeman was referring to a female consultant.

In May or June of 1998, Mr. Hernandez interviewed an African–American candidate for the position of marketing representative in Dallas, Texas. When Mr. Hernandez followed up with Helene Nelson, who also interviewed the candidate, she said that he would have a hard time getting upper management to hire the candidate because he was a "nigger." Similarly, when Mr. Hernandez followed up with Jerry Munson, who also interviewed the candidate, Mr. Munson used the same racial slur in reference to the candidate. Mr. Hernandez did not report the comments made by Mr. Nelson and Mr. Munson.

In March of 2000, Mike McGraw, DSI's Chairman and Chief Executive Officer, and Bill Conwell, Senior Vice President of Sales and Marketing, met with SYSCO representatives to address concerns that they had raised. After that meeting, Mr. Hernandez asked Mr. McGraw how the meeting went and asked what issues SYSCO had raised. In response, Mr. McGraw told Mr. Hernandez to "look in the mirror" and see what the problem is. Mr. McGraw also told Mr. Conwell, a non-Hispanic employee, to "look in the mirror" on several occasions.

Finally, as noted above, on April 19, 2001, John Rockeman called Mr. Hernandez a "stupid Spic." Denia Milne, DSI's Vice President of Human Resources witnessed John Rockeman use this racial slur.[2] She informed Mr. Rockeman that his behavior was inappropriate in the workplace and that he was not to behave in that manner again.

*Administrative Filings*

On October 16, 2001, Mr. Hernandez submitted a claim to the Equal Employment Opportunity Commission ("EEOC"). On November 13, 2001, he filed a claim with the Kansas Human Rights Commission ("KHRC"). The EEOC issued a notice of right to sue letter to him on March 27, 2002. The parties stipulated that Mr. Hernandez exhausted his administrative remedies available before the KHRC. On April 29, 2002, he filed this action.

Additional facts will be provided as they pertain to plaintiff's particular claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty*

---

**2.** The court recognizes that the defendant's evidence suggests that the comment was made in the course of friendly banter and was not perceived by plaintiff or intended by Mr. Rockeman as a slur. Of course, at the summary judgment stage, plaintiff's contrary evidence must be credited in characterizing the incident.

*Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

■ The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma,* 218 F.3d 1190, 1197–

98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## ANALYSIS

### I. Statute of Limitations

■ Mr. Hernandez has asserted claims of discrimination (in terms of compensation, duties, promotion, termination and post-termination conduct), retaliation, and hostile work environment. DSI argues that several of these claims are time barred under Title VII and Section 1981.[3]

### A. Limitation Period for Title VII Claims

■ "In a deferral state such as Kansas, a Title VII claimant must file his discrimination charge with the appropriate state or local agency, or with the EEOC, within 300 days of the alleged unlawful act." *Peterson v. City of Wichita, Kan.,* 888 F.2d 1307, 1308 (10th Cir.1989) (citing 42 U.S.C. § 2000e–5(e); *EEOC v. Commercial Office Prods. Co.,* 486 U.S. 107, 108, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988)). The undisputed evidence confirms that Mr. Hernan-

---

**3.** DSI also argued that Mr. Hernandez failed to exhaust his Kansas Act Against Discrimination ("KAAD") claims. In response, Mr. Hernandez noted that the parties agreed in the Final Pretrial Order that he "has exhausted his KHRC administrative remedies." In reply, DSI agrees, but argues that any conduct that occurred after May 13, 2001, is barred by the six-month limitation period contained in

the KAAD. The court does not consider this argument as it was raised for the first time in defendant's reply brief. *Liebau v. Columbia Cas. Co.,* 176 F.Supp.2d 1236, 1244 (D.Kan. 2001) ("Courts in this district generally refuse to consider issues raised for the first time in a reply brief."). Of course, DSI is free to raise this statute of limitation defense to the KAAD claims at trial.

dez filed his charge on October 16, 2001. DSI argues that Mr. Hernandez's claims must be based on conduct that occurred within the 300–day period preceding this date and that all Title VII claims based on acts that occurred prior to December 20, 2000, including his compensation claims, are time barred.

■ Mr. Hernandez, however, argues that DSI's alleged discriminatory conduct prior to December 20, 2000, is actionable under the continuing violation doctrine. In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), however, the Supreme Court clarified that the continuing violation doctrine was not applicable to discrete acts of discrimination that fall outside the statutory time period. *Kaster v. Safeco Ins. Co. of Am.*, 212 F.Supp.2d 1264, 1268 (D.Kan. 2002) (quoting *Morgan*, 122 S.Ct. at 2068, 122 S.Ct. 2061). "The Court further emphasized that 'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" *Id.* at 1269 (citing *Morgan*, 122 S.Ct. at 2072). Thus, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify...and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 122 S.Ct. at 2073.

In light of *Morgan*, the applicable limitation period bars Mr. Hernandez's Title VII discrimination claims based on DSI's acts that occurred prior to December 20, 2000. As such the court grants summary judgment in favor of the defendant as to such claims.[4]

## B. Section 1981 Limitations Provision

■ The Tenth Circuit has held that claims arising under § 1981(a) are subject to the personal injury statute of limitations in the state in which they arise, but claims arising under § 1981(b) are subject to the federal four-year statute of limitations established in 28 U.S.C. § 1658. *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1188–89 (10th Cir.2002). Section 1981(a) claims typically include discrimination in the formation of contracts while section 1981(b) claims include discrimination occurring after the contract, employment contract or otherwise, has been formed. *Id.* at 1193.

■ DSI contends that Mr. Hernandez's claims are subject to the four-year limitation period to file a civil action.[5] Because Mr. Hernandez filed his complaint on April 29, 2002, DSI argues that all his discriminatory compensation and work assignment claims based on conduct prior to April 29, 1998 are barred. Mr. Hernandez again alleges that his claims are timely under the continuing violation doctrine.

---

4. A review of Mr. Hernandez's claims indicates that the limitation period will bar some of his discriminatory compensation claims and discriminatory job assignment claims. His discriminatory failure to promote, discriminatory termination, discriminatory post-employment, and retaliation claims all appear to fall within the applicable limitations period for Title VII. Moreover, because one of the alleged acts of harassment occurred within the filing period, Mr. Hernandez's hostile work environment claim is also timely. *Morgan*, 122 S.Ct. at 2074 ("Provided that an act contributing to the claim occurs within the

filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

5. DSI explains that Mr. Hernandez's failure to promote claim might have been subject to a two-year limitation period, but the issue is moot because the facts demonstrate that the claim accrued on April 30, 2001, when he first learned he would not be promoted. As such, the claim would be timely even under a two-year limitation period.

However, "the continuing violation theory is a creature of the need to file administrative charges, and because a section 1981 claim does not require filing such charges before a judicial action may be brought, the continuing violation theory is simply not applicable." *Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1514 (10th Cir.1997).

As such, the court finds that the applicable statute of limitations bars all of Mr. Hernandez's Section 1981 claims that are premised on conduct that occurred prior to April 29, 1998. The court grants summary judgment in favor of DSI on such claims.

In the end, the court grants summary judgment on Mr. Hernandez's Title VII claims based on conduct that occurred prior to December 20, 2000. The court also grants summary judgment on Mr. Hernandez's Section 1981 claims based on conduct that occurred prior to April 29, 1998.

## II. Discrimination

█ Mr. Hernandez asserts discrimination claims premised on his compensation, job assignments and duties, failure to promote, termination, and post-termination conduct.[6] To prevail under Title VII, a plaintiff must show, through either direct or indirect evidence, that the discrimination complained of was intentional. *EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1191 (10th Cir.2000) (citing *Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1207 (10th Cir.1999)).

█ A plaintiff, such as Mr. Hernandez, who lacks direct evidence of intentional discrimination may use the burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to demonstrate intentional discrimination. *Id.* To survive summary judgment, then, plaintiff bears the initial burden of establishing a prima facie case by a preponderance of the evidence. *English v. Colorado Dep't of Corr.,* 248 F.3d 1002, 1008 (10th Cir.2001). If Mr. Hernandez establishes his prima facie case, the burden shifts to DSI to articulate some legitimate, nondiscriminatory reason for the decision to terminate plaintiff's employment. *Id.* If DSI successfully meets its burden of production, then Mr. Hernandez can avoid summary judgment only if he is able to put forth evidence sufficient to allow a reasonable jury to find that defendant's reasons are pretextual. *Id.*[7]

## A. Compensation and Job Duties

Mr. Hernandez alleges that he received disparate treatment in his compensation and job duties compared to similarly situated non-Hispanic employees. Specifically, he contends that DSI paid him a lower commission rate on his sales because of his race and/or national origin. He further alleges that DSI imposed disparate job responsibilities and requirements because of his race and/or national origin.

### 1. DSI's Compensation Structure

Mr. Hernandez argues that DSI's formula for computing his total compensation was disparate to that used with similarly situated white employees from fiscal year

---

6. In its memorandum in support of summary judgement, DSI argued that the post-termination conduct claims are more appropriately considered acts of retaliation. In his response, Mr. Hernandez addresses the post-termination conduct only in the context of retaliation. As such, the court addresses Mr. Hernandez's post-termination discrimination arguments under the retaliation claim.

7. The burden-shifting framework which the Supreme Court set forth in *McDonnell Douglas* applies equally to plaintiff's claims under Title VII, Section 1981 and the KAAD. *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1225 (10th Cir.2000); *Lewis v. Std. Motor Prods., Inc.,* 203 F.Supp.2d 1228, 1233 (D.Kan.2002).

1998 through December 31, 2000. DSI argues that he cannot establish a prima facie case of discrimination during calender years 1997 and 2000 because he was the highest paid employee in his position at DSI. Moreover, DSI argues that it imposed a lower commission rate on Mr. Hernandez's sales to promote the company's legitimate, non-discriminatory objective of maintaining fairness and reasonableness among the employees' salaries. Mr. Hernandez asserts that this objective is a pretext for discrimination.

### a. Prima Facie Case of Compensation Discrimination

▌▌ Mr. Hernandez may establish a prima facie case of discrimination by proving that he received compensation less favorable than similarly situated members of a non-protected class. *Amro v. Boeing Co.*, 232 F.3d 790, 798 (10th Cir.2000); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1362–63 (10th Cir.1997). DSI argues that he cannot make such a showing in calender year 1997 and 2000 because he was the highest paid individual at the company for his particular job.[8] While Mr. Hernandez's total compensation was comparable to or exceeded that of similarly situated employees, the summary judgment evidence establishes that his sales quotas[9] were higher or his rate of commission was lower than similarly situated white employees from fiscal year 1998 through the date he was terminated. An employer can discriminate against its highest paid employee by preventing him or her from earning as much as a non-protected employee would have earned under identical facts. As such, Mr. Hernandez

has demonstrated a prima facie case of discrimination.

### b. Legitimate, Non–Discriminatory Grounds and Pretext

Once Mr. Hernandez has satisfied his prima facie case, the burden of production shifts to the employer to articulate a facially nondiscriminatory reason for its employment decision. *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995). The Tenth Circuit has characterized the defendant's burden in this regard as "exceedingly light." *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir.), cert. denied, 528 U.S. 814, 120 S.Ct. 50, 145 L.Ed.2d 44 (1999).

▌▌ DSI contends that Mr. Hernandez's total compensation has historically been calculated using lower commission rates and higher sales quotas to facilitate its legitimate, non-discriminatory objective of achieving a basic level of fairness and reasonableness in compensation among similarly-situated employees. Specifically, DSI explains that the SYSCO account generates disproportionately higher levels of sales and revenue. For example, DSI anticipated that the SYSCO account alone would generate $3 million in gross margin. DSI recognizes that other account executives had compensation plans that included higher commission rates, but DSI anticipated that the gross margin on those accounts would range from $400,000 to $700,000, significantly lower than the revenue expectations of the SYSCO account. Given the disparity in the total revenue production (total gross margin) of the other executives' accounts, DSI proffers that

---

8. The court discusses compensation claims prior to December 20, 2000 and April 29, 1998 because while barred under Title VII and Section 1981, respectively, DSI did not timely raise the limitation period under the KAAD.

9. DSI explains that Mr. Hernandez was not required to obtain the quota in order to earn a commission. However, it also admits that an employee could obtain additional bonuses by meeting the quotas. As such, there was a financial benefit related to the quotas.

it created different commission structures to maintain fairness and reasonableness in the total compensation. In short, DSI tied Mr. Hernandez's commission percentage to the expected gross margin from the SYSCO account.

DSI has easily satisfied its relatively light burden of proffering a non-discriminatory basis for the disparate commission rates and quotas. *See, e.g., Komac v. Gordon Food Serv.,* 3 F.Supp.2d 850, 856 (N.D.Ohio 1998) (finding that defendant proffered a legitimate non-discriminatory basis for plaintiff's rate of salary reduction by explaining that it reduced plaintiff's salary at a greater rate because she acquired a more profitable sales territory); *Woodward v. Heritage Imports,* 773 F.Supp. 306, 311 (D.Utah 1991) (finding defendant's objective of bringing plaintiff's salary into parity with industry standards constituted legitimate, non-discriminatory basis for its act); *Green v. Edward J. Bettinger Co.,* 608 F.Supp. 35, 42 (E.D.Pa. 1984) (finding decision to reduce commission arrangement justified in order to preserve the morale of other similarly situated employees, and to head off a potential, undeserved, windfall for plaintiff). The burden now shifts to Mr. Hernandez to demonstrate that DSI's argument is a pretext for discrimination.

"A plaintiff can withstand summary judgment by presenting evidence sufficient to raise a genuine dispute of material fact regarding whether the defendant's articulated reason for the adverse employment action is pretextual." *Garrett v. Hewlett Packard Co.,* 305 F.3d 1210, 1217 (10th Cir.2002) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). "A plaintiff can show pretext by revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable fact-

finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reason.'" *Id.* (quoting *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997)). "More specifically, evidence of pretext may include, but is not limited to, the following: 'prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating ... criteria); and the use of subjective criteria.'" *Id.* (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1328 (10th Cir.1999)).

██ Here, Mr. Hernandez suggests that this justification is not worthy of belief because DSI has steadily increased his work assignments while decreasing the return on that work investment. DSI's justification for limiting his rate of compensation and increasing his quotas is that to be fair and reasonable all similarly situated employees should fall within the same range of total compensation. Implicit in this rationale is the notion that it would be unfair or inequitable for Mr. Hernandez to earn commissions at the same rate as other employees when he retains the company's largest account. Because he allegedly has a greater opportunity to earn with the SYSCO account, DSI contends that it had to manipulate his commissions and quotas to "keep his compensation within a reasonable, appropriate range." Plaintiff, however, maintains that servicing the SYSCO account took additional time and effort. Particularly during the time when he was a Regional Manager, Mr. Hernandez had to fulfill the duties of that position in addition to performing the duties of a Sales Representative by servicing the SYSCO account. To that end, Mr. Hernandez suggests that he had to work harder to make

lower returns on his transactions. *See Woods v. Schutte Lumber Co.*, 2003 WL 136187, at *9 n. 4 (W.D.Mo. Jan.10, 2003) ("[p]iling on distinctly harder work for the same pay can be as discriminatory as discriminatory pay for the same work."). Drawing all reasonable inferences in favor of Mr. Hernandez, a reasonable juror could conclude that DSI's compensation plan required Mr. Hernandez to attain higher goals and perform more duties for unequal pay. Viewed in that light, the reality of the compensation plan directly contradicts the rationale for limiting Mr. Hernandez's commissions and raising his quotas, i.e. fairness and reasonableness.

Though this evidence presents an extremely close case on summary judgment, the court finds that Mr. Hernandez's evidence has cast some doubt on DSI's proffered basis for the compensation differentials. This doubt, combined with his prima facie evidence that non-protected employees received better commission rates and lower quotas is sufficient to establish a genuine issue of material fact as to pretext.

### 2. Mr. Hernandez's Additional Job Duties and Responsibilities

 Mr. Hernandez argues that DSI discriminated against him by imposing upon him job duties and responsibilities that were not required of similarly situated white employees. In particular, Mr. Hernandez notes that he was the only Regional Manager required to manage a client account personally. Additionally, Mr. Hernandez explains that DSI required him to manage two regions, without receiving additional compensation.

As explained above, DSI required Mr. Hernandez to service the SYSCO account even when he was promoted to the position of Regional Manager. For the same reasons that these additional duties create a jury question as to his claim of wage discrimination, the court finds that Mr. Hernandez has demonstrated a genuine issue as to whether DSI discriminated against him on the basis of race or national-origin by assigning him the SYSCO account without additional compensation.

Mr. Hernandez further claims that DSI discriminated against him by requiring him to manage two regions in 2000. DSI argues that he cannot establish a prima facie case of discrimination because similarly situated non-protected employees were given similar job assignments without compensation. The court is mindful that in *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1195 n. 6 (10th Cir. 2000), the Tenth Circuit clarified that Mr. Hernandez need not compare himself to similarly situated employees to demonstrate a prima facie case of discrimination. In this case, however, Mr. Hernandez's claim that he received additional job assignments necessitates a comparison between his job assignments and those of his similarly situated non-protected employees. Thus a comparison to similarly situated employees is appropriate in analyzing whether plaintiff has met the elements of a prima facie case. *Tomita v. Univ. of Kansas Medical Center*, 227 F.Supp.2d 1171, 1181 (D.Kan.2002) (finding comparison to similarly situated employees appropriate where claim is based on less favorable treatment).

While Mr. Hernandez was not the only employee to manage two regions, DSI required him to manage the West Region for seven months, which is twice as long as Mr. Murphy and seven times as long as Mr. Cate. *English*, 248 F.3d at 1011 (citing *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1082 (10th Cir.1999))("dissimilar treatment between similarly situated protected and non-protected employees may give rise to an inference of discrimination."). Thus, Mr. Hernandez's term of dual management without compensation

was significantly longer than similarly situated non-protected employees. This differential treatment between protected and non-protected employees gives rise to an inference of discrimination, especially considering that "the burden imposed on a plaintiff at the prima facie stage is 'not onerous.'" *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1197 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). As such, Mr. Hernandez has demonstrated a prima facie case of discrimination and because DSI did not proffer any non-discriminatory basis for the term of his assignment, summary judgment is denied.

### B. Failure to Promote Mr. Hernandez to Vice President of Sales

In March or April of 2000, Mr. Hernandez informed DSI that he wanted to be considered for the Vice President of Sales position that DSI planned to create. Mr. Hernandez first learned that he would not be promoted to that position when DSI terminated his employment on April 30, 2001. Mr. Hernandez alleges that DSI did not promote him to the position based on his race and/or national origin.

Initially, DSI argued that Mr. Hernandez failed to establish a prima facie case of discrimination because it never created the position. In response, however, Mr. Hernandez set forth specific facts demonstrating that DSI created the posi-

tions in late 2000 and committed budget dollars to the positions by January of 2001. Upon reviewing this evidence, DSI conceded in its reply, for purposes of summary judgment, that the position was created and available. DSI, however, argued in its reply for the first time that the economic downturn was a legitimate, non-discriminatory reason for not promoting Mr. Hernandez and that Mr. Hernandez failed to "offer evidence from which a reasonable jury could conclude that DSI's inability to fund the position was a pretext for discrimination." [10] The court will not consider this argument as it has repeatedly disregarded issues raised for the first time in a defendant's reply brief. *See, e.g., Anderson v. Farmland Indus., Inc.*, 70 F.Supp.2d 1218, 1228 (D.Kan.1999); *see also Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1554 n. 6 (10th Cir. 1992) (court under no obligation to consider issue first raised in reply brief); *Tomita v. Univ. of Kansas Med. Center*, 2003 WL 1460367, at *13 n. 46 (D.Kan. Mar.20, 2003) (refusing to consider pretext argument because defendants raised it for the first time in their reply brief). Although DSI is free to make this argument at trial, summary judgment is denied as to this claim.

### C. Discriminatory Termination as Part of a Reduction in Force

On April 30, 2001, DSI terminated Mr. Hernandez's employment. Mr. Hernandez

---

**10.** DSI also argued in its reply that Mr. Hernandez failed to establish a prima facie case of discrimination because he applied for the position of Vice President of Sales in April of 2000, but DSI did not formally approve that position until late 2000. Thus, DSI contends that at the time Mr. Hernandez applied for the position, it was not yet "available." DSI, however, has offered no evidence suggesting that Mr. Hernandez withdrew his application once DSI formally created the position in late 2000 or had otherwise indicated that he did not wish to be a candidate. As such, the court finds that Mr. Hernandez has estab-

lished a prima facie case of discrimination based on failure to promote theory. *See Morgan v. FBL Fin. Serv., Inc.*, 178 F.Supp.2d 1022, 1030 (S.D.Iowa 2001) (finding evidentiary dispute as to whether employer knew that plaintiff was still interested in field adjuster position, among several other issues, sufficient to deny summary judgment on failure to promote claim); *Gentry v. Georgia–Pacific Corp.*, 250 F.3d 646, 652 (8th Cir.2001)(formal job application not required for prima facie case if opening was not officially posted and employer was aware of plaintiff's interest in the job).

argues that DSI terminated him based on his race and/or national origin. DSI denies any discrimination and contends that it merely terminated his employment as part of a reduction in force ("RIF").

 The required elements of a prima facie case of intentional race discrimination involving a reduction in force are "(1) a plaintiff was within the protected group, (2) plaintiff was doing satisfactory work, (3) plaintiff was discharged despite the adequacy of his work, and (4) there is some evidence that the employer intended to discriminate against the plaintiff in reaching its RIF decision." *Juarez v. ACS Gov't Solutions Group, Inc.*, 314 F.3d 1243, 1245–46 (10th Cir.2003) (citing *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir.1998)). "The fourth element can be satisfied by showing that the employer could have retained plaintiff but instead chose to keep someone of a different race." *Id.* The court finds that Mr. Hernandez has set forth specific evidence establishing a prima facie case of discrimination. In particular, he has demonstrated that DSI retained similarly situated, non-protected Regional Managers while terminating Mr. Hernandez.

DSI offers several legitimate, non-discriminatory grounds to support its decision to terminate Mr. Hernandez. DSI explains that it lost approximately $2 million in January and February of 2001. In response, DSI decided to reduce its work force to minimize the financial losses to the company. DSI instructed the senior vice president of each respective business area to select employees for termination. Michael McGraw and Mark Baldwin then reviewed the list of selected employees and decided whom to terminate, eventually terminating 86 employees in the RIF. Mr. Hernandez does not challenge the veracity of DSI's need to restructure. Instead, he suggests that DSI decided to select and approve his termination because of his race and/or national origin.

Although the only contemporaneous explanation Mr. Hernadez received concerning why he was terminated was Ms. Milne's statement that it was because DSI decided to "get out of the commodity hardware reselling business," the decision makers involved in the termination have offered their purported explanations for the action in the course of this lawsuit. Among Bill Conwell, Michael McGraw and Mark Baldwin DSI advanced in deposition testimony (after the RIF was complete) several grounds for selecting Mr. Hernandez to be included in the reduction: (1) Regional Managers under the restructured DSI needed to reside within the geographic boundaries of their territory and Mr. Conwell did not believe that Mr. Hernandez would relocate to satisfy this requirement; (2) DSI needed to reduce the number of Regional Managers they employed and Mr. Conwell thought Mr. Hernandez would be a candidate for the Director of Strategic Alliance position; (3) DSI needed to retain a Regional Director with more software experience than Mr. Hernandez; (4) Mr. Hernandez's region was not profitable and he demonstrated poor management skills.

 Mr. Hernandez attacks DSI's position by highlighting alleged weaknesses, implausibilities, inconsistencies, incoherencies, and/or contradictions in DSI's proffered legitimate reasons for selecting Mr. Hernandez. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (quotations omitted) (providing that a plaintiff may demonstrate pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence."). Mr. Hernandez may still

withstand summary judgment even if he fails to cast doubt on all of DSI's proffered reasons particularly where there are multiple asserted grounds offered by the employer, several of which are intertwined. *Bennett v. Emerson Elec. Co.*, 160 F.Supp.2d 1244, 1251 (D.Kan.2001); *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 920 (7th Cir.1996). As set forth below, plaintiff's evidence, taken as a whole, is sufficient to cast doubt on defendant's proffered reasons. For these reasons, summary judgment is inappropriate on plaintiff's discriminatory termination claim.

### 1. Residency Requirement as Pretext

Mr. Hernandez challenges the believability of the asserted legitimate basis related to Regional Managers residing within the geographic boundaries of their respective territories. First, Mr. Hernandez was never asked whether he would move in order to retain his position and never advised DSI that he was unwilling to relocate. While Gary Swanson once asked if he would transfer to Houston to service the SYSCO account and he responded that he preferred to stay in Kansas City, that inquiry occurred nearly one year before the reduction in force and certainly was not presented in the context of saving Mr. Hernandez's employment. No DSI representative, since that date, asked Mr. Hernandez if he was willing to relocate, especially in the context of saving his job. The court understands that when assessing a claim of pretext, it must examine the facts "as they appear to the person making the decision to terminate [the] plaintiff." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir.2000). Thus, Mr. Hernandez's subjective belief that he would have been willing to move would not be sufficient to establish pretext. That, however, is not his claim. Instead, he challenges the inherent believability of management's alleged subjective belief and whether this was a justification created in hindsight. Such evidence is probative because, "the relevant question is whether the reason articulated by the employer was the real reason for the challenged action." *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1261 (10th Cir. 2001).

Second, Mr. Hernandez challenges the veracity of the "residence requirement" because DSI historically permitted Regional Managers to reside outside of the geographic boundaries of their respective districts. For example, in fiscal year 1999, DSI permitted Mr. Hernandez to reside outside of the Southwest Region after promoting him to director of that region. From June 2000 through April 2001, Mr. Hernandez and Mike Murphy oversaw the West Region from locations outside that territory. As late as January of 2001, Bob Cate oversaw the Southeast Region from outside its boundaries. By pointing out the flaws in the factual basis put forth for DSI's alleged belief that Mr. Hernandez would not relocate and by disputing the veracity of the residence requirement based on the company's past practices, Mr. Hernandez's summary judgment evidence is such that a reasonable jury could find defendant's explanation unworthy of credence. *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

### 2. Candidate for Promotion as Pretext

As to the belief that Mr. Hernandez was a candidate for the Director of Strategic Alliances position, Mr. Hernandez explains

that this proffered ground suggests that DSI intended to retain Mr. Hernandez in the post-restructured DSI, rather than select him for termination. Thus, there is a potential logical breakdown in defendant's position that, in effect, "he should be terminated because he should be promoted" that could be viewed as a suspect after the fact justification. Moreover, DSI has argued that the same economic downturn prevented it from funding this position. A reasonable juror could find it inconsistent that DSI would select Mr. Hernandez for termination because it intended to promote him to Director of Strategic Alliances while at the same time knowing the position would never be funded.

### 3. Software Experience as Pretext

As to his software experience, DSI proffered no evidence suggesting that it adopted any policy or set of criteria for evaluating similarly situated employees for the reduction in force. Thus, it is at best unclear whether the software criteria was applied to all of the Regional Directors or only to Mr. Hernandez. Mr. Hernandez suggests that it is more than ironic that DSI relies on "software experience" as a basis for selecting the RIF when it assigned Mr. Hernandez duties and tasks (beyond those of similarly situated employees) that precluded him from developing those very skills. *See Edwards v. Hodel,* 738 F.Supp. 426, 428 (D.Colo.1990), aff'd as modified, *Edwards v. Lujan,* 40 F.3d 1152 (10th Cir.1994), (finding discrimination where only non-blacks were given the extra training provided by temporary assignments to other positions, which "eliminat[ed] any chance of advancement by Blacks."); *Holtz v. Marcus Theatres Corp.,* 31 F.Supp.2d 1139, 1150–51 (E.D.Wis.1999) (denying summary judgment on failure to promote claim where only those outside the protected group were allowed to participate in the training necessary for advancement). DSI also never suggested

that his software skills were deficient or that such a deficiency could hinder his future employment. Thus, Mr. Hernandez's evidence raises a possible inference that this criterion may have been a post-hoc justification for discrimination.

Additionally, it is unclear how DSI evaluated employees' software skills. DSI has proffered no evidence as to how management evaluated Mr. Hernadez's software skills and how or even if they compared them to those of similarly situated employees. *Garrett,* 305 F.3d at 1218 (finding genuine issues of material fact as to whether or not former employer's system of ranking and evaluation of employees was based upon objective criteria and was applied to all similarly-situated employees, and whether employer deviated from its normal procedures in ranking employee, precluded summary judgment). Thus, DSI's claim that it selected Mr. Hernandez because the company needed someone with superior software skills appears, based on the summary judgment evidence, to be founded on a subjective evaluation of Mr. Hernandez. While the Tenth Circuit has instructed that "the use of subjective criteria does not suffice to prove intentional discrimination," *Doan v. Seagate Technology, Inc.,* 82 F.3d 974, 978 (10th Cir.1996), it has more recently explained that it views "with skepticism subjective evaluation methods." *Garrett,* 305 F.3d at 1218; *see also Lundien v. United Airlines,* 242 F.3d 389, 2000 WL 1786579, at *5 (10th Cir. Dec.06, 2000) (citing *Bauer v. Bailar,* 647 F.2d 1037, 1045 (10th Cir.1981) for the proposition that subjectivity in the decision-making process can create a "strong" inference of bias). Thus, this proffered reason is not sufficient in the overall context of this case to grant summary judgment to the defendant.

### 4. Poor Performance as Pretext

As to Mr. Hernandez's alleged poor performance, he put forth evidence that DSI

retained similarly-situated non-protected employees. That is, DSI offered Mr. Murphy another position within the company even though his region was unprofitable.[11] *Redmond v. Day & Zimmerman, Inc.*, 897 F.Supp. 1380, 1385 (D.Kan.1995) (evidence that a company treated members of a protected class adversely to unprotected employees raises an inference of pretext). Moreover, the notion that Mr. Hernandez was performing inadequately is inconsistent with: (1) the fact that Mr. Conwell did not identify Mr. Hernandez as a poor performer when compiling his initial list of expendable employees; (2) the fact that DSI gave Mr. Hernandez a raise one month into its restructuring; (3) the fact that for the last six years he had been a top performer with DSI; and (4) DSI's decision to make Mr. Hernandez manage two regions from June of 2000 through December of 2000. These inconsistencies are further highlighted by the fact that DSI never told Mr. Hernandez that he was performing inadequately or that he needed to improve particular skills. *Luttjohann v. Goodyear Tire and Rubber Co.*, 927 F.Supp. 403, 409 (D.Kan.1996) (finding genuine issue of pretext in reduction in force where plaintiff provided evidence that her performance was comparable to other area managers; that she was not the worst performing area manager according to a "scorecard" system at the plant; that she was never told that her overall performance was unsatisfactory; that she was not informed she was discharged for poor performance until she had filed an administrative charge of discrimination); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir.2000) (finding that "poor job performance" justification was an afterthought, in part, because plaintiff never received a negative written performance evaluation or formal warning, nor was there any writing whatsoever criticizing his job performance).[12]

▆ In the end, while this case presents a close question on summary judgment, the court finds that Mr. Hernandez has offered evidence to cast doubt on the primary grounds DSI asserts for selecting plaintiff for the RIF.[13] As the Supreme Court recently held, a prima facie case of discrimination coupled with sufficient evidence of pretext is sufficient as a matter of law to show intentional discrimination. *Sanderson Plumbing Prods., Inc.*, 530 U.S. at 147–48, 120 S.Ct. 2097. As such, summary judgment is denied on this claim.

---

**11.** DSI cites to the deposition testimony of Mark Baldwin to suggest that Mr. Murphy was retained and placed in a lower paying position only because of his experience with its proprietary software. Mr. Hernandez alleges that DSI retained Mr. Murphy, but not him, because of race. The court recognizes that a subjective belief in discrimination does not preclude summary judgment. *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1408 n. 7 (10th Cir.1997). However, DSI's justification for retaining Mr. Murphy because of his software skills is subject to the same pretext arguments discussed herein. Thus, a reasonable jury could find that this reason is an after the fact justification or pretext, not worthy of credence.

**12.** DSI also contends that it selected Mr. Hernandez because he made poor presentations at monthly management meetings. This justification, however, is subject to the same challenges set forth in this section.

**13.** Plaintiff also argues that Mr. McGraw's "look in the mirror" statement evidences racial animus. The court disagrees. DSI presented evidence which Mr. Hernandez did not controvert that Mr. McGraw told non-protected employees to look in the mirror on several similar occasions. Moreover, Mr. McGraw made this comment on only one occasion and such "stray remarks" are insufficient to raise an inference of pretext. *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140–41 (10th Cir.), cert. denied, 531 U.S. 876, 121 S.Ct. 182, 148 L.Ed.2d 125 (2000).

## III. Retaliation

Mr. Hernandez argues that DSI retaliated against him by terminating his employment, interfering with prospective employment and filing a civil lawsuit shortly after he filed a discrimination complaint with DSI's Vice President of Human Resources, Ms. Milne. In support of its motion for summary judgment, DSI contends that Mr. Hernandez has failed to establish a prima facie case of retaliation because there is no evidence suggesting that the individuals responsible for the acts of retaliation knew that Mr. Hernandez engaged in protected activity. Alternatively, DSI offers alleged legitimate nondiscriminatory grounds for its challenged conduct.

### A. Prima Facie Case of Retaliation

 To establish a prima facie case of retaliation, plaintiff must demonstrate that (1) he engaged in protected activity; (2) he suffered an adverse employment action subsequent to or contemporaneous with his protected activity; and (3) a causal connection exists between the protected activity and the adverse action. *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir.2001) (citations omitted). Mr. Hernandez has demonstrated a prima facie case as to his claims of retaliatory discharge and retaliatory litigation.

First, Mr. Hernandez engaged in protected activity by complaining to DSI's Vice President of Human Resources about what he contends was Mr. Rockeman's racial slur. *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1255 (10th Cir.2001) (holding that informal complaints to superiors constitute protected activity). DSI does not suggest that this conduct is insufficient to constitute protected activity.

Second, the court finds that Mr. Hernandez has demonstrated that two out of the three alleged acts of retaliation constitute adverse acts. "Although the Tenth Circuit liberally defines an 'adverse employment action,' its existence is determined on a case by case basis and does not extend to a mere inconvenience or an alteration of job responsibilities." *Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1212–13 (10th Cir.2003) (internal quotes omitted). "To be an adverse action, the employer's conduct must be materially adverse to the employee's job status." *Id.* at 1213. Moreover, post-termination conduct can constitute an adverse act. *See, e.g., Berry v. Stevinson Chevrolet*, 74 F.3d 980 (10th Cir.1996) (affirming trial court's finding that plaintiff presented a prima facie case of retaliation based on post-termination conduct).

Mr. Hernandez's termination is an adverse employment act. *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir.2000) (termination is an adverse action under Title VII). Similarly, viewing the evidence in the light most favorable to Mr. Hernandez, DSI's decision to file a civil action can be construed as an adverse act. In deciding whether a particular threat or conduct is an adverse employment act, the court must consider whether the threat of the employer's action would deter victims of discrimination from complaining about discrimination, and " '[i]t is certainly true that a lawsuit...may be used by an employer as a powerful instrument of coercion or retaliation and that such suits can create a 'chilling effect' on the pursuit of a discrimination claim.' " *Ward v. Wal–Mart Stores, Inc.*, 140 F.Supp.2d 1220, 1231 (D.N.M.2001) (quoting *EEOC v. Outback Steakhouse of Florida, Inc.*, 75 F.Supp.2d 756, 758 (N.D.Ohio 1999)). The court agrees with the reasoning of *Ward* and finds that retaliatory civil litigation can constitute an adverse employment action for purposes of a retaliation claim.

 The court, however, finds that Mr. McGraw's statements to Mr. Hernandez's prospective employer, Mr. Najim, do not

constitute an adverse act. Mr. McGraw's suggestion that Mr. Najim not hire plaintiff did not prevent him from gaining employment with Sirius. Instead, Sirius hired Mr. Hernandez as its Regional Manager, demonstrating that Mr. McGraw's statements did not interfere with Mr. Hernandez's ability to obtain employment. As such, Mr. Hernandez has failed to establish a prima facie case of retaliation based on the post-employment comments of Mr. McGraw. *Hollowell v. Int'l Mill Serv., Inc.*, 66 Fed.Appx. 631, 634 (7th Cir.2003) (slip opinion) (finding that instances of alleged retaliation do not amount to adverse employment actions when plaintiff's evidence failed to demonstrate that defendant provided information about plaintiff's lawsuit or his job performance to potential employers, or that, if they had, the potential employer would have acted upon that information to plaintiff's detriment); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 753–54 (7th Cir.2002)(no adverse action where evidence did not demonstrate that defendant's comments elicited during a mock background check impacted plaintiff's surgical career opportunities); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 709 (7th Cir.1995) (finding post-termination comment to potential employer not retaliatory because it did not impact plaintiff's job prospects); *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.1999) (explaining that where there is no "admissible evidence that the statements of the former employer caused or contributed to the rejection by the prospective employer, the plaintiff has failed to present a prima facie case").

■ Finally, Mr. Hernandez has demonstrated that a causal connection exists between his termination and/or the filing of the litigation and his internal complaint of discrimination. Mr. Hernandez argues that the temporal proximity of his complaint combined with the adverse employment acts suggest a retaliatory motive.

Indeed, the Tenth Circuit has held that "[a] causal connection is established where the plaintiff presents 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1221 (10th Cir.2002) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir.1999)).

■ DSI, however, correctly points out that "the proximity between a specific [protected] activity and the alleged retaliatory act is meaningless unless those who caused the alleged retaliatory act to occur are shown to have been aware of the specific activity." *Hysten v. Burlington Northern and Santa Fe Ry. Co.*, 296 F.3d 1177, 1184 (10th Cir.2002) (citing *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir.1999)). DSI argues that summary judgment is proper because Mr. Hernandez "does not offer one shred of evidence that Conwell, Baldwin, or McGraw knew that he engaged in protected activity at the time of the adverse actions." The court disagrees and finds that a reasonable juror could infer from the evidence that Mr. Conwell and Mr. Baldwin were aware of Mr. Hernandez's complaint.

As explained above, the court assumes for summary judgment purposes that Mr. Hernandez complained about Mr. Rockeman's racial slur to Ms. Milne, the Vice President of Human Resources. Thereafter, Ms. Milne said she would handle the situation. Ms. Milne informed both Mr. Baldwin and Mr. Conwell about the event. Because the court has presumed for purposes of this motion that he complained about the incident, a juror could reasonably infer that either Ms. Milne informed Mr. Baldwin and/or Mr. Conwell of Mr. Hernandez's complaint when she briefed them about the event or that they inferred from her briefing that Mr. Hernandez had

objected to Mr. Rockeman's conduct.[14] This inference is further corroborated by the fact that Ms. Milne apologized to Mr. Hernandez on behalf of the company later that day. One could infer from this evidence that DSI management instructed her to apologize in response to Mr. Hernandez's complaint. These facts distinguish this case from *Hysten*, 296 F.3d *at 1184*, *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir.1993), *Hinson v. U.S.D. No. 500*, 187 F.Supp.2d 1297, 1311 (D.Kan.2002); *Stephens v. City of Topeka, Kan.*, 33 F.Supp.2d 947 (D.Kan.1999) and others where the plaintiff proffered no evidence from which the court could reasonably infer that the relevant decision makers had knowledge of the plaintiff's protected activity.

Therefore, the court finds that plaintiff has established a prima facie case of retaliation as to DSI's decision to terminate him and its decision to file civil litigation. The court, however, finds that Mr. Hernandez did not establish a prima facie case of retaliation based on Mr. McGraw's statements to Sirius, plaintiff's prospective employer.

### B. Legitimate, Non–Discriminatory Basis and Pretext

■■ DSI asserts that it terminated Mr. Hernandez as part of its reduction in force, not because of his race. For the same reasons that the court has found that Mr. Hernandez demonstrated a genuine issue of material fact as to whether DSI's asserted grounds for including him in the RIF were pretextual in the context of his discriminatory discharge claim, the court finds that Mr. Hernandez has similarly demonstrated a genuine issue of material fact as to pretext in the context of his retaliatory discharge claim.

■■ The court, however, does not believe Mr. Hernandez has demonstrated such pretext as to his retaliatory litigation claim. Two weeks after his termination, Sirius hired Mr. Hernandez as a Regional Manager. DSI explains that it decided to file suit against Sirius, Mr. Hernandez, and other former employees after it obtained evidence that Sirius had purloined a DSI proposal that took nearly half of a year to develop. Mr. Hernandez proffers evidence suggesting that DSI could not locate the non-compete agreement at the time he was terminated. Mr. Hernandez, however, does not allege that he never signed a non-compete agreement with DSI and he offers no evidence that challenges the veracity of DSI's claim that Sirius and its employees wrongfully converted its intellectual property. As such, the court finds that Mr. Hernandez has failed to establish a genuine issue of material fact that its grounds for filing the civil action are pretextual.

### IV. Racial Harassment

Mr. Hernandez claims that the defendants subjected him to harassment based on his race. In support of its motion for summary judgment, DSI argues that Mr. Hernandez has failed to set forth sufficient facts establishing a prima facie case of racial harassment. After considering plaintiff's evidence concerning the alleged conduct in light of the applicable standard for analyzing a racial harassment claim, the court agrees and finds that plaintiff has failed to demonstrate a material issue of fact as to his racially hostile work environment claim.

---

14. Mr. Hernandez does not offer any evidence suggesting that Mr. McGraw was aware that plaintiff had complained about the racial slur until after DSI received Mr. Hernandez's EEOC complaint in November of 2001. Therefore, even if Mr. McGraw's comments to Sirius could be construed as an adverse act, Mr. Hernandez could not establish a prima facie case of retaliation absent evidence that Mr. McGraw knew that Mr. Hernandez engaged in protected activity prior to the date he recommended Sirius not hire the plaintiff.

To state a claim for racial harassment, plaintiff must establish that "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and (2) the harassment was racial or stemmed from racial animus." *Witt v. Roadway Express,* 136 F.3d 1424, 1432 (10th Cir.1998) (quoting *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994)). In evaluating whether the alleged harassment is sufficiently severe or pervasive, the court looks at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Trujillo v. Univ. of Colorado Health Sciences Center,* 157 F.3d 1211, 1214 (10th Cir.1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). A few isolated incidents of racial enmity are insufficient to survive summary judgment. *Id.* (citing *Bolden,* 43 F.3d at 551). Rather, plaintiff must show "a steady barrage of opprobrious racial comments." *Bolden,* 43 F.3d at 551.

In support of his claim, Mr. Hernandez directs the court to four statements made by his supervisors and co-workers. First, at a management meeting in 1998, Mr. Hernandez overheard John Rockeman, Vice President of Solutions Development, state: "I'm tired of talking to that bitch. She's just a woman. She needs to get out of my face." Mr. Rockeman was referring to a female consultant.

Second, in May or June of 1998, Mr. Hernandez interviewed an African American candidate for the position of marketing representative in Dallas, Texas. When Mr. Hernandez followed up with Helene Nelson, who also interviewed the candidate, she said that he would have a hard time getting upper management to hire the candidate because he was a "nigger." Similarly, when Mr. Hernandez followed up with Jerry Munson, who also interviewed the candidate, Mr. Munson used the same racial slur in reference to the candidate.

Third, in March of 2000, Mike McGraw, DSI's Chairman and Chief Executive Officer, and Bill Conwell, Senior Vice President of Sales and Marketing, met with SYSCO representatives to address concerns that they had raised. After that meeting, Mr. Hernandez asked Mr. McGraw how the meeting went and asked what issues SYSCO had raised. In response, Mr. McGraw told Mr. Hernandez to "look in the mirror" and see what the problem is.

Fourth, on April 19 or 20, 2001, John Rockeman called Mr. Hernandez a "stupid Spic." Denia Milne, DSI's Vice President of Human Resources, witnessed Mr. Rockeman use this racial slur. She informed Mr. Rockeman that his behavior was inappropriate in the workplace and that he was not to behave in that manner again.

In sum, plaintiff points to only four isolated comments over the course of nearly four years. This evidence fails to demonstrate that he was subjected to "a steady barrage of opprobrious racial comment" as required by the case law of the Tenth Circuit to show a racially hostile work environment. *Bolden,* 43 F.3d at 551; *accord Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1366 (10th Cir.1997) (five separate incidents perpetrated by plaintiff's supervisor, although "unpleasant and boorish," were not sufficiently severe or pervasive to create an actionable hostile work environment).[15] Stated another way,

---

15. The court does not intend to suggest that Mr. Hernandez may properly aggregate these

because the comments were neither severe nor pervasive, they are not actionable under Title VII. *Bolden*, 43 F.3d at 551 (affirming summary judgment in favor of defendant where evidence showed that two of plaintiff's co-workers made overtly racial remarks, including warning plaintiff that they knew people in the Ku Klux Klan and using the term "nigger" in plaintiff's presence; racial jokes and slurs were "infrequent" and because the comments were not pervasive, they were not actionable). "Although socially inexcusable, they are a few isolated incidents of racial enmity . . .which the law cannot redress." *Witt*, 136 F.3d at 1432. In the absence of sufficient evidence to support the inference of severe or pervasive racial harassment, summary judgment in favor of DSI is warranted.

## CONCLUSION

In the end, the court grants summary judgment as to Mr. Hernandez's Title VII and Section 1981 claims that arose prior to the applicable limitation periods. The court denies summary judgment on Mr. Hernandez's discriminatory compensation and job assignment claim, his failure to promote claim, and his discriminatory termination claim. The court also denies summary judgment on his retaliatory discharge claim. The court, however, grants summary judgment as to plaintiff's retaliation claims based on DSI's alleged interference with prospective employers and its decision to file a civil action against Mr. Hernandez. The court also grants summary judgment as to the hostile work environment claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (Doc. 63) is **granted in part and denied in part.**

---

statements, two of which did not target him and were relevant to a different gender or racial group and one of which the court previously found not to be a racial reference in the context of this case, to demonstrate a prima facie case of harassment. The court only finds that even considering these statements in the aggregate, summary judgment is proper.